**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Rafael Eduardo FREYRE–LAZARO, Orestes Miguel Diaz–Gonzalez, and Eufemio Ruben Llerena–Acosta, Defendants–Appellants.**

No. 91–5646.

United States Court of Appeals,
Eleventh Circuit.

Oct. 8, 1993.

---

Andrew Cotzin, Broad & Cassel, Miami, FL, for Rafael Eduardo Freyre–Lazaro.

Miguel del Aguila, Miami, FL, for Orestes Miguel Diaz–Gonzalez.

John E. Bergendhal, Miami, FL, for Eufemio Ruben Llerena–Acosta.

Dexter W. Lehtinen, U.S. Atty., Carol Herman, Linda Collins Hertz, and Anne Ruth Schultz, Miami, FL, for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and HOBBS,* Senior District Judge.

* Honorable Truman M. Hobbs, Senior U.S. District Judge for the Middle District of Alabama, sitting by designation.

HOBBS, Senior District Judge:

Appellants are three defendants who raise an assortment of challenges to their convictions for their roles in a conspiracy to purify contaminated cocaine. Defendants Orestes Miguel Diaz–Gonzalez, Eufemio Ruben Llerena–Acosta, and Rafael Eduardo Freyre–Lazaro were each indicted on four counts and tried together. The jury found all three guilty of Count I, possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and Count II, conspiracy to distribute cocaine in violation of 21 U.S.C. § 846. The jury convicted Diaz–Gonzalez of Count III, possession with intent to distribute cocaine within 1,000 feet of a school in violation of 21 U.S.C. § 845a.[1]

We affirm the convictions of Llerena–Acosta and Freyre–Lazaro and the conviction of Diaz–Gonzalez on Counts II and III. However, we vacate Diaz–Gonzalez' conviction on Count I and remand his case to the district court for resentencing.

## I. FACTS

Defendant Diaz–Gonzalez owned a farm in northwest Dade County, Florida. In 1990, Miguel Oliva, a twice-convicted felon who became a DEA confidential informant in January, 1991, began working at Diaz–Gonzalez' farm as a cattle tender.

Through Diaz–Gonzalez, Oliva met Diaz–Gonzalez' son, Diaz–Acosta.[2] Diaz–Acosta owned the Botanica El Valle Azul in Hialeah, Florida. The Botanica sold religious artifacts, cement garden statues, herbs, and other objects associated with the Santeria religion.[3] The second floor of the Botanica housed offices and an area where the statues were painted. The ground floor served as the retail store and was adjoined by an outdoor work area with a shed.

At the Botanica, Oliva met defendant Freyre–Lazaro (Freyre), the father-in-law of Diaz–Acosta, and defendant Llerena–Acosta (Llerena), a nephew of Diaz–Gonzalez. Both defendant Freyre and defendant Llerena were employed at the Botanica.

During a three week period beginning on January 18, 1991, Oliva met with the defendants and recorded approximately twenty-three hours of conversation by means of a surveillance device that he wore.

On January 20, 1991, Oliva and Diaz–Gonzalez met at Diaz–Gonzalez' house and discussed the possibility of Oliva purchasing 30 kilograms of cocaine from Diaz–Acosta. The total price of $360,000 was to include Oliva's $500 per kilogram broker's fee. Because the DEA would not agree to this arrangement, the deal was never consummated.

The following day Oliva met with Diaz–Acosta at the Botanica. Their tape-recorded conversation revealed that Diaz–Acosta had 50 kilograms of cocaine and that his "friend" had 40 kilograms of cocaine which had been contaminated with diesel fuel. In order to fetch a full price, Diaz–Acosta planned to decontaminate the "dirty" cocaine by removing the diesel fuel. Oliva agreed to assist Diaz–Gonzalez and Diaz–Acosta in the purification process.

The cocaine purification was to take place at the Botanica with Oliva being paid $500 for each decontaminated kilogram. Two methods of purification were contemplated. The first method involved soaking the cocaine in a solution of ammonia and water in a trash can, filtering it, and then drying the cocaine under light bulbs or in a clothes dryer. The second method involved immersing the cocaine in an acetone solution containing hydrochloric acid, which caused the diesel fuel to separate from the cocaine.

---

1. This statute now is codified at 21 U.S.C. § 860 and for consistency's sake is cited as such in this opinion.

2. Diaz–Acosta was tried with the three appellants and found guilty on all four counts: conspiracy to distribute cocaine, possession with intent to distribute cocaine, possession with intent to distribute cocaine within 1,000 feet of a school, and use of a firearm during drug distribution. This

court granted Diaz–Acosta's motion to dismiss his appeal.

3. The practices of the Santeria religion were the subject of the Supreme Court's recent decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

The first cocaine treatment occurred at the Botanica on January 30, 1991, when three kilograms of cocaine were transformed to cocaine base through the first method of purification. Diaz–Acosta and defendants Llerena and Freyre participated in the conversion process. Llerena assisted in the pouring and filtering steps. Freyre brought rope and helped tie a sheet to filter the cocaine. Part of the drying was done in a clothes dryer in Diaz–Gonzalez' house.

On February 7, 1991, Oliva, Diaz–Acosta, Freyre, and Llerena all helped decontaminate cocaine at the Botanica by following the second treatment method. Diaz–Acosta told Oliva that 7.4 kilograms of cocaine were in the solution and that 35 more kilograms of cocaine were awaiting purification. When Oliva arrived at the Botanica on February 12, 1991, for another round of cocaine decontamination, he discovered 17 kilograms of cocaine already soaking in acetone. Both Llerena and Freyre assisted in the process. When the cocaine was in its finished form, it was pressed into kilogram blocks and then placed in a large box which Diaz–Acosta loaded into the front of his car.

Diaz–Acosta then drove his car to Diaz–Gonzalez' house and parked it. Upon entering the driveway, Diaz–Acosta was stopped by a police detective who asked Diaz–Acosta for identification and the car's registration. A search of Diaz–Acosta's car yielded thirteen kilograms of cocaine and a .380 caliber semiautomatic firearm. A subsequent inventory search of the car yielded a small package of cocaine.

Shortly after Diaz–Acosta was arrested, law enforcement officers converged on the Botanica and arrested Llerena and Freyre. Diaz–Gonzalez was arrested at his farm. An inventory search of the truck Diaz–Gonzalez was driving at the time of his arrest (conducted by DEA agents) yielded a .9 mm automatic pistol.

Pursuant to warrants, searches were conducted of the Botanica and of Diaz–Acosta's home. These searches yielded over $126,000 of cash, four firearms, a kilogram press, a cash counting machine, and a microwave oven with cocaine residue. In a search of Diaz–Gonzalez' house, officers found three guns and aluminum pans with cocaine residue.

## II. DISCUSSION

### 1. Pretrial

### A. Motion to Suppress

Diaz–Gonzalez first challenges the district court's denial of his motion to suppress evidence on the ground that his wife, Doris Diaz, did not voluntarily consent to a search of their house on the day of his arrest. Diaz–Gonzalez contends that because his wife was shaken by the arrest of her son (Diaz–Acosta) at the house, "she was in no state to give consent." At a pretrial hearing on the motion, the district court heard testimony from two Hialeah Police Department Detectives and from Doris Diaz.

Detective Carlos Diaz testified that Doris Diaz appeared "rational" and "lucid" and that he asked her in Spanish if she would consent to a search of her house. Detective Diaz explained to Mrs. Diaz that the search was connected to her son's arrest and that the officers would be looking for evidence of narcotics crimes. Detective Diaz also testified that he advised Doris Diaz that she was not required to consent.

Detective Lee Mock testified that Mrs. Diaz, although "nervous" and "concerned," was not sobbing or broken down. Detective Mock read the consent form in Spanish to Mrs. Diaz. The form, which stated that no promises, threats, or coercion had been used to extract the consent, was signed by Mrs. Diaz with detectives Diaz and Mock as witnesses. The detectives did not have their guns drawn nor did they raise their voices during their conversation with Mrs. Diaz.

Doris Diaz testified that she had not read the consent form, nor was the form explained to her. The district court ruled that Mrs. Diaz' consent was given "freely, voluntarily and intelligently" and judged that her testimony was not believable.

It is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to con-

sent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973). The determination of voluntariness is a question of fact to be decided from the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48. The district court's factual finding that consent was given voluntarily will not be overturned unless clearly erroneous. *United States v. Blake,* 888 F.2d 795, 798 (11th Cir. 1989). "This is true because the trial judge usually bases his finding on credibility choices resulting from conflicting testimony." *United States v. Garcia,* 890 F.2d 355, 359 (11th Cir.1989).

■ We conclude that the district court's factual finding that Doris Diaz voluntarily consented to a search of her house was not clearly erroneous. After listening to conflicting accounts of the circumstances surrounding Mrs. Diaz' consent, the district court determined that "the little lady's testimony is not worthy of belief." The district court instead chose to accept the testimony of police detectives Diaz and Mock. Their testimony established that Mrs. Diaz, a woman of rational demeanor, had witnessed the arrest of her son outside her home. Although Mrs. Diaz was upset over her son's arrest, both detectives testified that she was not too distraught to comprehend the implications of the search and had signed the consent form after being advised in her native tongue that her consent was not mandatory.

Because Doris Diaz gave valid consent to the search, the warrantless search of the home did not violate the Fourth Amendment, and the district court properly held that a plastic dryer shelf, aluminum pans with cocaine residue, and three firearms found in the house, could not be suppressed as trial evidence.

## B. Severance

Defendant Freyre criticizes as an abuse of discretion the district court's denial of his motion for severance. He asserts that because the government's case against Diaz–Acosta and Diaz–Gonzalez was "overwhelming and highly prejudicial," the jury drew unreasonable inferences resulting from his mere presence and association with the co-conspirators. This, he says, denied him a fair trial.

The law of this circuit is clear that the denial of a motion for severance will be reversed only for abuse of discretion since, particularly in conspiracy cases, "persons who are charged together should also be tried together." *United States v. Morales,* 868 F.2d 1562, 1571 (11th Cir.1989). "To establish an abuse of discretion the defendant must demonstrate that without severance he was unable to receive a fair trial and that he suffered compelling prejudice against which the trial court could offer no protection." *Id.* (quoting *United States v. Magdaniel–Mora,* 746 F.2d 715, 718 (11th Cir. 1984)). This court has also said that a defendant does not suffer compelling prejudice "simply because much of the evidence at trial is applicable only to codefendants." *United States v. Smith,* 918 F.2d 1501, 1510 (11th Cir.1990) *cert. denied,* — U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 117 (1991).

■ We find that the district court did not abuse its discretion in denying Freyre's severance motion. The jury's ability to consider the evidence pertaining to each defendant separately is reflected by the verdict. Although all three appellants were indicted on four counts, the jury acquitted Freyre and Llerena on Counts III and IV, possession with intent to distribute cocaine within 1,000 feet of a school, and use of firearms during drug distribution. Furthermore, the district court's jury charge militates against Freyre's complaint that the jury neglected to weigh separately the evidence against each defendant. The district court instructed the jury as follows:

A separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense and the evidence pertaining to it should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or more of the defendants guilty or not guilty of any of the offenses charged should not affect your verdict as to any other offense or any other defendant.

The prejudice that Freyre alleges resulted from the joint trial was not "clearly beyond the curative powers" of this cautionary instruction. *United States v. Garrett*, 727 F.2d 1003, 1014 (11th Cir.1984) (quoting *United States v. Phillips*, 664 F.2d 971, 1017 (5th Cir.Unit B 1981)). Defendant Freyre's challenge to the refusal of the court to grant his severance motion is without merit.

### 2. Trial

### A. Sufficiency of the Evidence

When a defendant challenges his criminal conviction on sufficiency of the evidence grounds, we review the evidence in a light most favorable to the government to determine whether a reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Thomas*, 987 F.2d 697, 701 (11th Cir.1993) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

" 'In applying this standard all reasonable inferences and credibility choices must be made in favor of the jury verdict, and that verdict must be sustained if there is substantial evidence to support it....' " *United States v. Pintado*, 715 F.2d 1501, 1503 (11th Cir.1983) (per curiam) (quoting *United States v. Davis*, 666 F.2d 195, 201 (5th Cir.Unit B 1982)).

### 1. *Conspiracy*

■ To uphold the appellants' convictions, we must find that the government proved beyond a reasonable doubt that: 1) a conspiracy existed; 2) the appellant knew of the conspiracy; and 3) the appellant voluntarily joined the conspiracy. *United States v. Mieres-Borges*, 919 F.2d 652, 657 (11th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1633, 113 L.Ed.2d 728 (1991). "[P]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.' " *United States v. Khoury*, 901 F.2d 948, 962 (11th Cir.1990) (quoting *United States v. Malatesta*, 590 F.2d 1379, 1381 (5th Cir.), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979)).

After reviewing the record and viewing the evidence in a light most favorable to the government, we conclude that neither Diaz–Gonzalez, Freyre, nor Llerena has sustained his burden of showing that no reasonable trier of fact could conclude that he was guilty of conspiracy to distribute cocaine beyond a reasonable doubt.

### *Diaz–Gonzalez*

■ Diaz–Gonzalez contends that because he was present at the farm and not at the Botanica for cocaine processing, and since he was not at home when his clothes dryer was used to dry the cocaine, a rational jury could not conclude beyond a reasonable doubt that he conspired to possess and distribute cocaine. This argument is unavailing.

Substantial and compelling evidence at trial showed that Diaz–Gonzalez was a key player in the conspiracy. Diaz–Gonzalez sparked the venture by referring Oliva to his son, Diaz–Acosta, knowing that Diaz–Acosta wanted to dispose of a batch of contaminated cocaine. Diaz–Gonzalez' commitment to the purification venture was clearly demonstrated. He loaned his farm as a site for cocaine processing and as a storage facility for ten gallons of ether used in the decontamination process.

On February 5, 1991, Diaz–Gonzalez was joined at his farm by Oliva and Diaz–Acosta in a session to convert three kilograms of cocaine base into cocaine hydrochloride. Diaz–Gonzalez' dedication to the venture was further established by his visits to the Botanica during the pendency of the conspiracy. In sum, Diaz–Gonzalez' absence from the Botanica during cocaine processing there, and from his house while his clothes dryer was being used to dry the cocaine, does not defeat his conspiracy conviction.

### *Freyre*

■ Freyre argues that his mere presence at the Botanica was insufficient to convict him of conspiracy. The cornerstone of Freyre's argument is that any assistance given to Diaz–Acosta and Oliva at the Botanica was part of his legitimate job responsibilities as a Botanica employee. The government, on the other hand, contends that Freyre's

activities at the Botanica more properly reflect his participation in the cocaine decontamination scheme. These activities, the government maintains, show that Freyre knew of the conspiracy. We agree.

A reasonable juror could infer from a "collocation of circumstances" that Freyre knowingly participated in the scheme to decontaminate Diaz–Acosta's cocaine. *United States v. Malatesta*, 590 F.2d at 1381. The evidence at trial established that during the first cocaine purification session at the Botanica on January 30, 1991, Freyre fetched a rope to tie a sheet over a plastic garbage can in which the cocaine was soaking. The sheet was used to filter the cocaine. On February 6, 1991, Freyre loaded a microwave oven into Oliva's car which was later used to dry cocaine at Diaz–Gonzalez' farm. The next day, Freyre located a hose to add more water to the cocaine solution and put up a no trespass sign at the Botanica. On February 12, 1991, Freyre, armed with a gun, helped turn over the plastic garbage can and rinsed away its cocaine residue with a hose.

Freyre's testimony at trial undermined the theory that his Botanica activities were legitimate employee duties and cast doubt on his credibility. His mainstay at trial was that he had been making a "little donkey" figurine while the cocaine was being processed. When asked whether he was ever told that Oliva was cleaning cocaine at the Botanica, Freyre responded: "No, sir. I do not know what cocaine is. And if he tells me, I still would not know because I don't know what that is."

On cross-examination Freyre explained that Oliva's statement "I am getting the base out" referred to the base in which the Botanica's cement images are placed, rather than to the cocaine base being processed. In evaluating Freyre's credibility, the jury could compare his claim that physical frailty prevented him from lifting the plastic garbage can with the cocaine solution and pouring out the contents with DEA Agent Curtis' testimony that he had personally observed Freyre at the Botanica "carrying statues, hauling bags of cement, [and] carrying bags of gravel."

Concerning the trespass sign that he erected immediately after a Hialeah Police detective had passed through an alley bordering the Botanica, Freyre testified: "I was going to put up that sign because a lady walked in to look at some molds and she almost fell down. . . . I had to give her a hand so she would not fall on the ground. And I told her 'Ma'am there is no insurance here.'" Freyre was also unable to explain why the statues made in molds lubricated with diesel fuel would not retain an odor.

Credibility is a factual issue to be decided by the jury. *United States v. Parrado*, 911 F.2d 1567, 1571 (11th Cir.1990), *cert. denied*, 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991). In reviewing Freyre's sufficiency of the evidence challenge, credibility determinations and all reasonable inferences are made in favor of the jury's verdict. *United States v. Pintado*, 715 F.2d at 1503. In this case, Freyre's improbable testimony and evidence of his contribution to the decontamination venture were sufficient for the jury to convict him of conspiracy to distribute cocaine.

*Llerena*

■ Like Freyre, Llerena posits that he was a legitimate employee at the Botanica who happened to be present when Oliva and the Diazes carried out activities in furtherance of the conspiracy. While we are mindful that mere association with coconspirators, *United States v. Correa–Arroyave*, 721 F.2d 792, 796–97 (11th Cir.1983), or presence at the criminal scene, *United States v. Sullivan*, 763 F.2d 1215, 1218 (11th Cir.1985), is insufficient to establish knowing participation in a conspiracy, our review of the evidence leads us to conclude that a reasonable jury could have found Llerena guilty of conspiracy beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Viewed in the light most favorable to the government, the evidence showed that: (1) on January 30, 1991, Llerena helped to pour and filter the cocaine solution at the Botanica; (2) on February 7, 1991, Llerena strolled from the Botanica to a nearby hardware store and purchased a 32 gallon grey plastic garbage can; (3) later that day, a

police detective on surveillance walked by the Botanica and noticed Llerena, Diaz–Acosta, and Oliva standing over the grey garbage can; (4) in reaction to the detective passing by Llerena yelled out "ten cuidado!" ("be careful!"); (5) on February 12, 1991, Llerena helped filter the cocaine solution at the Botanica as the surveillance device that confidential informant Oliva wore transmitted Llerena complaining of stinging hands, admonishing Oliva to "stretch the rope well," and in reaction to the powerful smell generated by the diesel fuel commenting "the odor is a bitch"; (6) when law enforcement officers converged on the Botanica on the afternoon of February 12, 1991, Llerena resisted arrest and threw a plastic bag of cocaine from his pocket.

The jury reasonably could have inferred from the enumerated circumstances that Llerena knew of the conspiracy and voluntarily joined it. *Mieres–Borges*, 919 F.2d at 657. Here we cannot say that the evidence implicating Llerena "proved nothing more than a mere relationship to a conspirator and a mere presence at the scene." *United States v. Villegas*, 911 F.2d 623, 631 (11th Cir.1990).

### 2. *Possession with Intent to Distribute*

■ In order to sustain the appellants' convictions for possession with intent to distribute cocaine, the government must have proved beyond a reasonable doubt: "(1) knowing (2) possession of a controlled substance (3) with intent to distribute it." *United States v. Morales*, 868 F.2d 1562, 1573 (11th Cir.1989) (quoting *United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir.1983)). Our previous analysis of Diaz–Gonzalez' role in the cocaine decontamination scheme enables us to conclude easily that there was more than sufficient evidence for a reasonable jury to convict Diaz–Gonzalez for the substantive crime of possession with intent to distribute cocaine.

■ Count I of the indictment also charged Freyre and Llerena with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The government, under 18 U.S.C. § 2, was permitted to show that Freyre and Llerena aided and abetted Diaz–Acosta, who was arrested with thirteen one-kilogram blocks of processed cocaine in the front of his car. To convict these defendants under aiding and abetting in violation of 18 U.S.C. § 2, the government must prove that Freyre and Llerena associated themselves with the venture and sought by their actions to make the venture a success. *United States v. Bascaro*, 742 F.2d 1335, 1364 (11th Cir.1984). The evidence of Freyre and Llerena's knowing contribution to the cocaine purification sessions at the Botanica was sufficient to support their convictions for possession with intent to distribute cocaine on an aiding and abetting theory of liability.

### B. Jury Charge

Defendant Llerena contests the district court's decision not to include certain jury instructions in its charge to the jury. First, he assails the district court's refusal to instruct the jury on multiple conspiracies. Second, he disputes its refusal to tender an instruction that a conspiracy cannot be founded upon family or blood relationships.

■ In reviewing jury instructions, we evaluate whether the entire charge, as a whole, adequately presented the law and the facts to the jury. *United States v. Elkins*, 885 F.2d 775, 788 (11th Cir.1989), *cert. denied* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990). A trial court's refusal to give a requested theory-of-defense instruction, however, is reversible error only if the requested instruction "(1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Camejo*, 929 F.2d 610, 614 (11th Cir.1991), *cert. denied Setien v. United States*, —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991).

### 1. *Multiple Conspiracies*

■ The gist of Llerena's argument is that because he alleges the case involved two distinct conspiracies, he was entitled to a multiple conspiracy charge. Llerena posits

that although he and Freyre might have been members of a conspiracy to manufacture cocaine, they were not part of the Diaz–Acosta/Diaz–Gonzalez conspiracy to possess cocaine with intent to distribute. This argument, in which Llerena attempts to distinguish between the manufacture and possession of cocaine, simply lacks merit. The evidence in the case clearly demonstrated the existence of a single conspiracy to decontaminate impure cocaine carried out over a short time span and involving the same participants. We find accordingly that the district court did not err in refusing to instruct the jury on multiple conspiracies.

### 2. *Family Relationship*

■ Llerena also insists that the district court erred in failing to give his proposed jury instruction that a conspiracy cannot be based on family ties. The rationale behind such an instruction—to show that mere presence and association with codefendants is insufficient alone for a conspiracy conviction—was encompassed in the district court's conspiracy charge and fully explained as a defense theory in Llerena's opening and closing argument. The district court's failure to give this instruction, therefore, did not "seriously impair" Llerena's defense. *Camejo,* 929 F.2d 610 at 614.

### C. Exhibit

■ Freyre challenges the district court's decision to exclude a diesel dispenser from evidence. He sought to introduce the dispenser to bolster his claim that it was used to mix diesel with oil, and that its air compressor was employed to spray the Botanica's molds before cement was added to make statues. After Freyre had successfully admitted a photograph of the dispenser, the court ruled to exclude the dispenser itself as cumulative evidence.

We review the admissibility of evidence for abuse of discretion and reverse a defendant's conviction only upon a showing that the abuse of discretion resulted in substantial harm to the party seeking relief. *United States v. Cameron,* 907 F.2d 1051, 1059 (11th Cir.1990). Here, the exclusion of evidence was neither an abuse of discretion, nor sub-stantially harmful to Freyre. The photograph of the dispenser, received in evidence, sufficiently allowed Freyre to document its significance to the jury.

### 3. Sentencing

### A. Sentencing Guidelines

Appellants contest their respective sentences under the Federal Sentencing Guidelines (Guidelines) on several grounds. We first address Freyre and Llerena's challenge of the amount of cocaine involved in the offense. This amount, which the district court found to be 50 kilograms, helps determine the defendants' base level offense under Guidelines Section 2D1.1. Llerena and Freyre were both sentenced to concurrent terms of 188 months imprisonment on Counts I and II and to five years of supervised release.

■ The district court's determination of the quantity of drugs used to establish a base offense level for sentencing purposes is a factual question subject to the clearly erroneous standard. *United States v. Robinson,* 935 F.2d 201, 205 (11th Cir.1991). Guidelines section 2D1.4 mandates that the offense level "shall be the same as if the object of the conspiracy.... had been completed" and notes that a defendant is responsible for the amount of drugs that he knew, or should have reasonably foreseen, was the object of the conspiracy. U.S. Sentencing Commission, *Guidelines Manual,* § 2D1.4 (Nov. 1990), comment. (n. 1). *See United States v. Andrews,* 953 F.2d 1312, 1319 (11th Cir. 1992). On January 21, 1991, Diaz–Acosta told Oliva, the confidential informant, that he had 50 kilograms of cocaine which he planned to decontaminate. During the cocaine purification session at the Botanica on February 7, 1991, in which Freyre and Llerena both participated, Diaz–Acosta expressly referenced the 35 kilograms of cocaine awaiting decontamination. On February 12, 1991, the day the defendants were arrested, 27 kilograms of cocaine had been processed.

The evidence at trial established that the operation was ongoing and that assistance from Freyre and Llerena would be forthcoming until Diaz–Acosta had decontaminated his

50 kilogram cocaine stock. At the sentencing hearing, the district court found that Freyre and Llerena were "absolutely aware of a minimum of 50 kilos as sure as God makes green apples." This finding, upon which Freyre and Llerena's offense levels for sentencing were based, was not clearly erroneous.

■ Freyre and Llerena also argue that the district court's two level enhancement of their sentences for firearm possession was erroneous. We disagree. Pursuant to Guidelines section 2D1.1(b)(1), a coconspirator's possession of a firearm supports the enhancement of a second coconspirator's offense level if: "(1) the firearm possessor was charged as a coconspirator; (2) the coconspirator possessed the firearm in furtherance of the conspiracy; and (3) the coconspirator who is to receive the sentence enhancement was a member of the conspiracy at the time that his coconspirator possessed the firearm." *United States v. Gates,* 967 F.2d 497, 500 (11th Cir.1992) (citing *United States v. Otero,* 890 F.2d 366, 367 (11th Cir.1989)).

Here, the government successfully met all three of these requirements. When Diaz–Acosta was arrested shortly after leaving the Botanica with thirteen kilograms of newly pressed cocaine on February 12, 1991, the police retrieved a semiautomatic firearm from the back floorboard of his car. At the time of Diaz–Acosta's arrest, Freyre and Llerena were members of the conspiracy. Finally, it was reasonably foreseeable that Diaz–Acosta, in furtherance of the conspiracy, would carry a weapon while transporting thirteen kilograms of cocaine.

■ The district court credited Freyre with a two level downward adjustment under Guidelines section 3B1.2(b) after finding that he was a "minor participant" in the conspiracy. Freyre's final urge to this Court is that he was a "minimal participant" in the scheme and therefore entitled to a four level decrease pursuant to Guidelines section 3B1.2(a).

Once again, we review the district court's factual finding on this sentencing issue for clear error. *United States v. Forbes,* 888 F.2d 752, 754 (11th Cir.1989). The district

court's decision to apply an adjustment "involves a determination that is heavily dependent upon the facts of the particular case." *Guidelines Manual,* § 3B1.2 (Nov.1990), comment. (backg'd). The commentary to the Guidelines states that a "minor participant" is one "who is less culpable than most other participants, but whose role could not be described as minimal." *Id.* at comment. (n. 3). The evidence showed that Freyre knew of the decontamination scheme and willingly participated in it. We therefore see no reason to disturb the district court's decision.

■ Having determined that there was no clear error in Freyre and Llerena's sentences, we turn now to review the sentence that the district court imposed on Diaz–Gonzalez. Diaz–Gonzalez argues that the district court misapplied section 5G1.1(c)(2) of the Guidelines by construing 21 U.S.C. § 860 as requiring a doubling of the minimum mandatory ten-year sentence required by 21 U.S.C. § 841(b). Although the district court has discretion to double the maximum punishment of life imprisonment authorized by § 841(b), the government concedes that a mandatory doubling of the § 841(b) minimum sentence of ten years imprisonment is not ordained by § 860.

The parties do not dispute that the district court properly determined Diaz–Gonzalez' base offense level to be 37. Cross-referenced with a criminal history category of I, Diaz–Gonzalez' presumptive guideline sentence range was 210 to 262 months imprisonment. The district court sentenced Diaz–Gonzalez to concurrent terms of 240 months imprisonment on Counts I, II, and III, to be followed by a concurrent term of five years supervised release on Counts I and II and a consecutive term of ten years supervised release on Count III.

Diaz–Gonzalez' 240 month sentence was imposed to comply with Guidelines § 5G1.1(c)(2) direction that it be "not less than any statutorily required minimum sentence." The district court, however, incorrectly determined that enhancement of the minimum sentence under 21 U.S.C. § 860 was a mandatory enhancement. That statute provides in relevant part that a person who violates § 841(a)(1) by possessing with intent

to distribute a controlled substance within 1,000 feet of an elementary school is "subject to (1) twice the maximum punishment authorized by section 841(b) of this title for a first offense." [4] 21 U.S.C. § 860, however, is silent as to any minimum mandatory penalty with the exception of mandating a minimum sentence of one year imprisonment. For this reason, we remand Diaz–Gonzalez' case to the district court for resentencing. We also remand Diaz–Gonzalez' sentencing on double jeopardy grounds as hereinafter discussed.

### B. Double Jeopardy

■ Diaz–Gonzalez contends that he received multiple punishments for the same conduct in violation of the Fifth Amendment's double jeopardy clause. Specifically, Diaz–Gonzalez argues that his Count I conviction for possession with intent to distribute cocaine under 21 U.S.C. § 841(a) is a lesser included offense of his Count III conviction for possession with intent to distribute cocaine within 1,000 feet of an elementary school under 21 U.S.C. § 860. Citing *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the government maintains that if the legislature so intends, multiple punishment can be constitutionally imposed under two statutes proscribing the same offense.

The Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) announced that for double jeopardy purposes, two crimes are to be treated as the same offense unless each crime requires proof of an additional element that the other does not require. Under this test, 21 U.S.C. § 841(a) and 21 U.S.C. § 860 constitute the same offense for double jeopardy purposes.

As noted before, 21 U.S.C. § 860 states that a person who possesses with intent to distribute a controlled substance within 1,000 feet of a school is subject to:

(1) twice the maximum punishment authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. A fine up to twice

that authorized by section 841(b) of this title may be imposed in addition to any term of imprisonment authorized by this subsection.

21 U.S.C. § 860(a).

There is no evidence that Congress intended to impose the § 860 punishment in addition to the § 841 punishment. *Hunter,* 459 U.S. at 365–66, 103 S.Ct. at 677–78. We believe that Congress intended to apply § 860 in lieu of § 841(b) when the offense occurs within 1,000 feet of a school.

"While the government may charge a defendant with both a greater and a lesser included offense and may prosecute those offenses at a single trial, the court may not enter separate convictions or impose cumulative punishments for both offenses unless the legislature has authorized such punishment." *United States v. Kaiser,* 893 F.2d 1300, 1303 (11th Cir.1990) (citations omitted). We agree with the Fifth Circuit's recent decision in *United States v. Scott,* 987 F.2d 261, 266 (5th Cir.1993) that a § 841(a) violation is a lesser included offense of § 860. Given the Supreme Court's direction in *Ball v. United States,* 470 U.S. 856, 864, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985) (district court must vacate one of underlying convictions), the proper remedy in this case is to vacate Diaz–Gonzalez' § 841 conviction and remand for resentencing under § 860.

### III. CONCLUSION

For the foregoing reasons, the convictions of Llerena–Acosta and Freyre–Lazaro, and Diaz–Gonzalez' conviction on Counts II and III, are AFFIRMED. Diaz–Gonzalez' conviction on Count I is VACATED and his case is REMANDED to the district court for resentencing consistent with this opinion.

---

**4.** Since the maximum sentence authorized by § 841(b) is life imprisonment, the district court could choose to impose a double life sentence on Diaz.