[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 15, 2004
THOMAS K. KAHN
CLERK

————————

No. 03-12263

————————

D. C. Docket No. 99-00137 CR-T-N-2

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee
                              Cross-Appellant,

                    versus

CLARENCE CLAY,

                              Defendant-Appellant
                              Cross-Appellee.

————————

Appeals from the United States District Court
for the Middle District of Alabama

————————

**(July 15, 2004)**

Before DUBINA, CARNES and CUDAHY*, Circuit Judges.

_____
*Honorable Richard D. Cudahy, United States Circuit Judge for the Seventh Circuit, sitting by designation.

DUBINA, Circuit Judge:

Appellant Clarence Clay ("Clay") appeals his convictions and sentences imposed by the United States District Court for the Middle District of Alabama. In addition, the government cross-appeals from the district court's refusal to impose a two-level enhancement to Clay's sentence. For the reasons that follow, we affirm.

## I. BACKGROUND

After a trial, a jury found Clay guilty of conspiracy to distribute and possess with intent to distribute four kilograms of cocaine hydrochloride, 50 or more grams of cocaine base, and 1,000 or more kilograms of marijuana, all in violation of 21 U.S.C. §§ 841(a)(1) and 846, and with unlawful use of a communication facility, a telephone, in violation of 21 U.S.C. § 843(b). The jury was, however, unable to agree on the amount of drugs that should be attributed to Clay. The district court sentenced Clay to 56 months imprisonment, but permitted him to remain free on bond pending the outcome of this appeal.

John W. Barnes ("Agent Barnes") is a Senior Special Agent with the United States Customs Service. At the time of the events in this case, Agent Barnes was assigned to the High Intensity Drug Trafficking Area ("HIDTA") task force in

Montgomery, Alabama. The HIDTA task force is a federally funded investigative task force composed of federal, state, and local law enforcement officers. HIDTA's stated mission is to locate, identify, and dismantle drug smuggling/trafficking organizations.

In December 1997, Agent Barnes received a request from Bill Baker ("Agent Baker"), a fellow Customs agent in Cincinnati, Ohio, seeking information about an individual by the name of "John Riley" in Montgomery, Alabama. Agent Barnes requested and received information from the Montgomery Police Department, which he forwarded to Agent Baker in Cincinnati. Agent Barnes confirmed that the John Riley, who was the subject of Agent Baker's interest, was also the John Riley identified through the Montgomery Police Department. Thereafter, Agents Barnes and Baker began working together in a narcotics investigation that impacted Alabama and Kentucky.

In April 1998, Tony Montoya ("Montoya"), a cooperating individual ("CI"), assisted Agents Barnes and Baker, along with others, in arranging a controlled meeting between Montoya and Riley. The purpose of the meeting was for Riley to deliver money to Montoya for marijuana that had previously been delivered to Riley. When the meeting occurred, Agent Barnes and others through the use of surveillance equipment were able to monitor Riley giving Montoya $77,500. In

addition to monitoring Riley, the agents monitored the money that Riley gave to Montoya as it left Montgomery and traveled across the border into Mexico through Laredo, Texas. The following month, a second delivery occurred. After arriving in Montgomery, Montoya contacted Riley via pager and cell telephone. Agent Barnes supervised these contacts. Again, the agents set up surveillance in an adjoining hotel room and monitored the delivery of approximately $60,000 by Riley to Montoya. Montoya continued to provide agents with information about Riley and his contacts outside the district.

Unable to identify Riley's local co-conspirators, Agent Barnes decided to obtain pen registers for Riley's cellular telephone with the hopes of obtaining authorization to intercept Riley's telephone conversations. Records obtained through subpoena revealed that Clay subscribed to the cellular telephone number used by Riley to communicate with Montoya and other CIs, and the cellular phone bills went to Clay's home address at 1030 Lynwood Drive, Montgomery, Alabama. Based on this information about the unlawful use of the cellular telephone subscribed to by Clay, the government sought and obtained a wire tap order. On June 3, 1999, eleven days into the wire tap, agents intercepted a conversation between Clay and Riley. During this conversation, Clay complained about the poor quality of the marijuana and his inability to sell it. Riley tried to

4

relieve Clay's anxiety by promising to pick up the marijuana and give him some new marijuana when the next shipment came in. Additionally, Clay and Riley used numbers that were consistent with those used by Riley in a conversation with unindicted co-conspirator, Louis Calvin Cook ("Cook"), when Riley and Cook talked about marijuana.

When Riley realized that he was being followed by agents, he met with Clay and gave him the cellular telephone. Clay took the cellular telephone to a local Powertel office and changed the number. Additionally, Clay specifically requested that the SIM card (i.e., a computer chip that identifies the phone number with that card) be changed, resulting in the termination of the first court authorized wiretap for that particular cellular telephone. While in possession of the cellular telephone, Clay answered the telephone and identified himself as Riley's "partner" and promised to deliver a message to Riley. After changing the number to the aforementioned cellular telephone, Clay returned it to Riley.

On July 15, 1999, agents executed several search warrants at locations associated with Riley, including Clay's residence at 1030 Lynwood Drive, Montgomery, Alabama. The agents also searched Riley's stash house at 1702 French Street, Montgomery, Alabama, and Riley's main address at 5713 Portsmouth Drive, Montgomery, Alabama. Agents seized several firearms from

5

each of these locations (i.e., two from Clay's residence, eight from Riley's home residence, and four from Riley's stash house).

The evidence produced at trial demonstrated that Clay was the subscriber for the telephone that Riley used to conduct his drug trafficking business from 1996 to 1999 through which Riley possessed and distributed thousands of pounds of marijuana, more than fifty grams of cocaine base, and four kilograms of cocaine hydrochloride. During the trial, the government also presented the testimony of co-conspirator Roderick Blanding ("Blanding"), who testified that he worked for Riley. According to Blanding, Clay was one of Riley's regular customers.

## II. ISSUES

1. Whether the district court erred in concluding that the prosecutor's comments before the grand jury did not substantially influence the grand jury's decision to return the superseding indictment in this case.

2. Whether the evidence was sufficient to sustain Clay's conviction for the unlawful use of a communication facility, to wit, a telephone, in violation of 21 U.S.C. § 843(b).

3. Whether drug quantity becomes an element of the offense under federal drug trafficking statutes only when it may be used to impose a sentence above the applicable statutory maximum.

**CROSS-APPEAL**

1. Whether the district court committed clear error when it overruled the government's objection to enhance Clay's offense level by two points because Clay's co-conspirators possessed dangerous weapons during the drug conspiracy.

## III. STANDARDS OF REVIEW

This court reviews the district court's denial of a defendant's motion to dismiss an indictment based on prosecutorial misconduct before the grand jury under an abuse of discretion standard. *United States v. Waldon*, 363 F.3d 1103, 1108 (11th Cir. 2004).

"Whether the record contains sufficient evidence to support the jury's verdict is a question of law subject to *de novo* review." *United States v. To*, 144 F.3d 737, 743 (11th Cir. 1998). When conducting a review of the record, this court views the evidence in the light most favorable to the government and resolves all reasonable inferences and credibility evaluations in favor of the jury's verdict. *Id.* This court "must uphold the jury's verdict whenever a reasonable

factfinder could conclude that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 743-44.

This court will review *de novo* appeals alleging error in an indictment under *Apprendi,*[1] but we will reverse only for harmful error. *United States v. Sanchez*, 269 F.3d 1250, 1272 (11th Cir. 2001) (en banc). *"Apprendi* error is constitutional error, subject to harmless or plain error review depending on the timing of the constitutional objection." *Id.*

## CROSS-APPEAL

We review for clear error the district court's findings of fact regarding whether a defendant should receive an enhanced sentence under the United States Sentencing Guidelines. *United States v. Gallo*, 195 F.3d 1278, 1280 (11th Cir. 1999).

## IV. ANALYSIS

After reviewing the record, reading the parties' briefs, and having the benefit of oral argument, we affirm issues one and two of Clay's appeal without

---

[1] *Apprendi v. New Jersey,* 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

further discussion.[2]  We feel compelled, however, to address Clay's drug quantity issue and the government's cross-appeal sentence enhancement issue.

## A.  __Drug Quantity__

Clay argues, for the first time on appeal, that his conviction should be reversed because the jury that unanimously found him guilty of being a member of a drug conspiracy could not unanimously agree that the amount of drugs alleged in the superseding indictment should be attributed to him.  We have held that a defendant who has not presented his objection to the district court must show plain error on direct appeal.  *United States v. Hasson*, 333 F.3d 1263, 1276 (11th Cir. 2003).  Thus, the defendant must show (1) that an error occurred, (2) that is plain, and (3) that affects substantial rights.  *Id.*

Clay contends that his conspiracy conviction should be reversed because the jury could not unanimously agree that the amount of drugs alleged in the superseding indictment should be attributed to Clay.  No authority supports this *Apprendi*-related contention, and most of Clay's argument is nothing more than an attack on this Court's holding in *Sanchez*.  Clay received a 50-month sentence for violating § 841(b)(1)(D), when the maximum sentence that statutory provision sets for the smallest quantity of drugs is 60 months.  Under *Sanchez*, no error occurred.

---

[2]  See 11th Cir. R. 36-1.

9

Clay recognizes that in *Sanchez*, we held that drug type and quantity are not required to be alleged in the indictment, submitted to the jury, and proved beyond a reasonable doubt, as long as the statutory maximum punishment is not exceeded. *See Sanchez*, 269 F.3d at 1268 ("To repeat the oft-repeated, *Apprendi* explicitly limited its holding to facts 'that increase[] the penalty for a crime beyond the prescribed statutory maximum.' Therefore, *Apprendi* has no effect on cases in which a defendant's actual sentence falls within the range prescribed by the statute for the crime of conviction."). Clay's contention is that because the jury was asked to ascertain the quantity of drugs for which he was accountable and was unable to unanimously agree on that, the government failed to meet its burden of proving every element of the charge beyond a reasonable doubt. The flaw in Clay's reasoning is that the specific quantity of drugs for which he was accountable is not an element of the crime charged. *See United States v. Matthews*, 168 F.3d 1234, 1245 (11th Cir. 1999). Under *Sanchez*, specification of quantity does not become essential unless the amount of the drugs involved is used to increase the defendant's sentence beyond the applicable maximum penalty for the smallest detectable quantity. In this case it was not.

Had the district court sentenced Clay to a term of imprisonment above the 60-month maximum for any detectable quantity of drugs, *see* § 841(b)(1)(A)

(maximum sentence of life if 1000 kg or more of marijuana); § 841(b)(1)(B) (40-year maximum if more than 100 of marijuana), Clay would have a point under *Apprendi*. However, recognizing that the failure of the jury to agree on a specific drug quantity limited the type of sentence it could impose on Clay, the district court sentenced him to only 50 months, which is below the 60-month maximum that he could have received pursuant to § 841(b)(1)(D). Therefore, in light of our reasoning in *Sanchez*, the 50-month sentence was in the permissible range and the district court did not plainly err. *See also United States v. Richards*, 302 F.3d 58, 66 (2d Cir. 2002) ("[D]rug quantity becomes an element of the offense under § 841 only where it may be used to impose a sentence above the statutory maximum sentence" because "the constitutional rule of *Apprendi* does not apply where the sentence imposed is not greater than the prescribed maximum for the offense of conviction").

**B.  Cross-Appeal – Enhancement Under U.S.S.G. § 2D1.1(b)(1)**

During the trial, the government presented evidence that in July 1999, pursuant to a search warrant, authorities seized drugs and various firearms from Riley's French Street residence. Authorities also seized numerous firearms from Riley's main residence located at Portsmouth Drive. Information regarding the search of Clay's residence, however, was not presented at trial because the district

court previously had granted Clay's motion to suppress the search of his residence. The government also presented Blanding's testimony that he had passed out drugs for Riley and that, between 1996 and 1999, Clay had picked up drugs at Riley's French Street residence on a weekly basis. The district court, however, later found at the sentencing hearing that Blanding's testimony was not fully credible, particularly with regard to the number of drug transactions between Clay and Blanding, "because of the way he testified." [R-26 at 16-17].

At sentencing, the government objected to the presentence investigation report's failure to recommend a two point enhancement to the offense level for possession of a firearm. The government explained that firearms were seized from the closet of Clay's residence during a search warrant, and that, although the items seized were suppressed before trial, information regarding them was admissible for sentencing purposes. The government also reasoned that Riley possessed firearms at his French Street residence, the "stash house for the drugs," where, it asserted, Clay received drugs for distribution. The district court overruled the government's objection. The court found that it was clearly improbable that the firearms found in the closet of Clay's residence were connected to the offense of conviction. The court also found that the firearms found in Riley's residence were not reasonably foreseeable to Clay.

On appeal, the government argues that the firearms found at co-conspirator Riley's French Street residence and Portsmouth Drive residence were reasonably foreseeable to Clay, asserting that possession of firearms is a common tool of the drug trafficking trade. The government also contends that Clay qualifies for the firearm enhancement because (1) the conspiracy involved a significant amount of drugs; (2) during the conspiracy, Clay repeatedly picked up drugs from the French Street residence, where firearms were found; (3) Clay subscribed to a cellular telephone that Riley used to conduct his drug trafficking business; and (4) Clay possessed two firearms at his residence from where he discussed drugs with Riley. Clay responds that his role was simply to provide cellular telephone service to Riley; thus, the firearms were not foreseeable to him.

Under U.S.S.G. § 2D1.1(b)(1), the court may adjust upward a defendant's base offense level by two levels "[i]f a dangerous weapon (including a firearm) was possessed . . . ." "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n. 3). In order for a district court to apply a § 2D1.1(b)(1) enhancement based on a co-conspirator's possession of a firearm, the government must prove by a preponderance of the evidence that "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in

13

furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, *and* (4) the co-conspirator['s] possession was reasonably foreseeable by the defendant." *Gallo*, 195 F.3d at 1284. The only factor at issue here is the fourth, reasonable foreseeability.

After reviewing the record, we conclude that the district court did not clearly err in finding that Riley's possession of the firearms was not foreseeable to Clay. Blanding had stated in an interview that Clay regularly picked up drugs at the "stash house;" however, the district court found that Blanding's testimony was not fully credible because of the way in which he testified. "We accord great deference to the district court's credibility determinations." *United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999). While we have recognized, as the government asserts, that "[t]here is a frequent and overpowering connection between the use of firearms and narcotics traffic," *United States v. Cruz*, 805 F.2d 1464, 1474 (11th Cir. 1986), we hold that absent some specific connection between the firearms and the particular drug activity, the district court is not compelled to find that the § 2D1.1(b)(1) enhancement applies.

Finally, we note that *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1506 (11th Cir. 1993), where we found reasonable foreseeability of possession of a weapon by a co-conspirator where the co-conspirator transported thirteen

14

kilograms of cocaine is inapposite. *Freyre-Lazaro* predates *Gallo*, which added the foreseeability factor to the § 2D1.1(d)(1) analysis based on a co-conspirator's possession. Moreover, although *Freyre-Lazaro* involved a large amount of cocaine, nothing in the decision indicates that the amount of drugs was a consideration for this enhancement. While the government attempts to also attribute to Clay the firearms found in Riley's Portsmouth Drive residence, the government fails to explain how these firearms were foreseeable to Clay, and no evidence exists connecting Clay to the firearms found in that residence.

With regard to the firearms found in the closet of Clay's residence, the government fails to challenge on appeal the district court's finding that it was improbable that the firearms were connected to the drug conspiracy offense, except to assert that Clay used the telephone at his own residence to discuss drugs with Riley. However, no evidence exists that drug-related objects were found in proximity of the firearms. By contrast, in *United States v. Hall*, 46 F.3d 62 (11th Cir. 1995), we affirmed the application of the enhancement where a set of scales, a ziplock bag with cocaine residue, and a purse containing $12,000 were found in a bedroom, along with a handgun found in a dresser drawer next to an undetermined amount of cash, in a house where conversations concerning the marijuana importation occurred. 46 F.3d at 63-64. We conclude that the district court did

15

not clearly err in finding that it was improbable that the firearms found in Clay's residence were connected to the offense. Accordingly, we conclude that the district court did not clearly err in refusing to impose a two-level enhancement under U.S.S.G. § 2D1.1(b)(1).

For the foregoing reasons, we affirm Clay's convictions and sentences.

**AFFIRMED.**