[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————

No. 12-14372
Non-Argument Calendar

————————

D. C. Docket No. 4:11-cv-00038-CDL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CURRENCY,
$21,175.00 IN US,

Defendant,

TERRANCE DURR,

Claimant-Appellant.

————————

Appeal from the United States District Court
for the Middle District of Georgia

————————

(June 4, 2013)

Before DUBINA, Chief Judge, WILSON and ANDERSON, Circuit Judges.

PER CURIAM:

This is a civil forfeiture case brought under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* After a bench trial, the district court concluded that the government established by a preponderance of the evidence that there was a substantial connection between $21,175 seized from Claimant-Appellant Terrance Durr ("Durr") during a traffic stop and illegal drug activity. It therefore held the currency was subject to forfeiture. For the reasons that follow, we affirm the district court's judgment.

I.

On Saturday, October 30, 2010, at approximately 7:37 a.m., Deputy Drew Crane ("Deputy Crane") of the Harris County Sheriff's Office stopped a white Chrysler Sebring on Interstate 185 North because he observed the car had a burned out tag light, and the car's driver was not properly maintaining his lane. Jerry Lamar Lett ("Lett") was driving the car, and Durr was seated in the front passenger seat.

When Deputy Crane approached the car and asked Lett to roll down the window, Deputy Crane detected a strong odor of alcohol and marijuana coming from inside the car. He also noticed the key in the car's ignition was not attached

2

to any other keys, and he observed a large bulge in Durr's front left pants pocket. Based on this observation, he asked for and received consent from Durr to search his person.[1]  Upon conducting the search, Deputy Crane discovered the bulge was $1,200 in United States currency rolled up with multi-colored rubber bands. Deputy Crane asked Durr if there was any more currency in the car, and Durr stated there was not.[2]

While issuing Lett a traffic citation, Deputy Crane learned the car was owned by Cedric Deon Gude and Terry Williams, both of whom were not present at the traffic stop.  Lett told Deputy Crane that he and Durr were on their way to Sandy Springs, Georgia to look at some houses and that they had been on the road for two to three hours.  Deputy Crane then asked for and received written consent from Lett to search the car.[3]

The search of the car revealed a blue and white plastic bag hidden under the passenger seat containing approximately $20,000 in United States currency.  The currency was wrapped in multi-colored rubber bands in $1,000 increments, a fact Deputy Crane stated indicated to him that the currency could possibly be linked to

---

[1] There is no Fourth Amendment challenge to the search of Durr's person.

[2] Durr's testimony at trial was that he did not remember Deputy Crane asking him if there was any more currency in the car.  However, given that Deputy Crane testified otherwise and that the video tape of the stop was not conclusive, the district court was entitled to accept Deputy Crane's testimony.

[3] There is also no Fourth Amendment challenge to the search of the car.

3

illegal drug activity.  Deputy Crane asked to whom the currency belonged, and eventually Lett indicated the currency belonged to Durr.  Deputy Crane asked Durr if the currency belonged to him.  Durr initially hesitated before admitting it did belong to him.

Deputy Crane asked Durr why he was carrying such a large sum of currency. Durr stated he and Lett were on their way to Atlanta[4] so that Durr could go to a Bank of America branch to attempt to get a piece of property he owned out of foreclosure.  Durr stated that Lett had picked him up around 2:30 a.m. from the Playboy strip club in Dothan, Alabama, and after a short stop at Durr's house to retrieve the currency, he and Lett started the drive to Atlanta.  Lett had to drive Durr because Durr's driver's license was suspended.

A criminal background check revealed that both Lett and Durr had previous drug trafficking convictions.  Durr had been convicted of drug trafficking in 1994 and 1996, received 98 months' imprisonment, and was released in 2007.  Since his release, Durr had never failed a drug test or violated his probation in any way.  Lett had received a drug trafficking conviction in 2000.  Based on this information, Deputy Crane seized the currency and ordered Lett and Durr to follow him to the

---

[4] Deputy Crane stated at trial that he considered the difference in Lett and Durr's responses regarding their destination to be a suspicious discrepancy.  However, the district court noted that Sandy Springs is often considered a suburb of Atlanta.

4

Harris County Sheriff's Office where they would be given a receipt for the seized currency.

While at the Sheriff's Office, Deputy Dwight Duke "Deputy Duke" conducted a canine sniff of both the car and the currency. The canine, Cierra, gave a positive alert for drug odor on both the currency and the car. However, no drugs were found on either Lett or Durr or in the car. Neither Deputy Crane nor Deputy Duke conducted a sobriety test for drugs or alcohol on either Lett or Durr.

## II.

Based on this evidence, the government filed a verified complaint contending the $21,175 seized from Durr was subject to forfeiture pursuant to § 881(a)(6). At the bench trial, the government presented testimony from Deputy Crane and Deputy Duke, as well as video tape evidence of the stop. Deputy Crane testified about the stop and the basis for his seizure of the currency. Deputy Duke provided extensive testimony regarding Cierra's training, certification, and the reliability of her alert to the currency and car. During the government's case in chief, before Durr had decided to take the stand, the district court admitted evidence of Durr and Lett's prior drug convictions. The court said the evidence would be admissible as character evidence against Durr, should Durr decide to testify, and that the evidence was relevant to the question whether the currency was

5

substantially connected to illegal drug activity. [R. 54 at 116–117.] The court agreed to reconsider the admissibility of the evidence in the event that Durr did not testify. [*Id.* at 116.]

Durr did ultimately testify when presenting his case. He testified that he had amassed $16,175 of the currency, his life savings, during his employment at Adams Beverage, Inc. by carefully saving his money over a period of nearly eight years. [*Id.* at 139.] He produced evidence that he made approximately $30,000 a year before taxes. [R. 39-1 at 18–22.] He stated that his only expenses were child support, some utilities, and vehicle payments before he lost his license. [R. 54 at 171–72.] The remaining $5,000 was a loan from his father who had recently won $10,000 at a casino. [*Id.* at 134, 163.] When asked why he kept his life savings in a bag under his grandmother's bed rather than at a bank, Durr testified that his grandmother told him it was not safe to keep his money in a bank because of the rash of bank failures in recent years. [*Id.* at 140, 145.] He also stated that he withdrew the money from his bank account at Army Aviation Bank, which Adams Beverage required him to have for direct deposit purposes; however, he produced no documentation that he was withdrawing his money from the account over time. [*Id.* at 147–48.]

6

As to the purpose of the trip to Atlanta, Durr testified that his family had been scammed by his stepmother's son, Ron, into buying property in Atlanta apparently in 2007.  [*Id.* at 172.]  While the exact circumstances of the transaction are unclear, Durr stated that Ron convinced him and seven other members of his family, including his grandmother and father, to sign paperwork for property, that Ron would take out a loan in their names to pay for the property, and that they would give Ron money to pay down the loan, and if the money ran out, Ron would resell the property and make a profit.  [*Id.* at 137.]

Durr produced a warranty deed indicating Alicia Burnett was the grantor, and he was the grantee of a piece of property in Atlanta.  [*See* R. 39-2 at 4.]  But he stated he had never met Alicia Burnett.  [R. 54 at 179.]  He also produced a document that appeared to be a security deed securing a line of credit for $66,000 from Bank of America with the deeded property as security.  [R. 39-2 at 6.]  Durr also stated that he and the other seven individuals placed $2,500-$3,000 each into an account at Bank of America from which Ron was to make withdrawals to pay down the loan.  [R. 54 at 154.]  He testified that Ron had agreed that when the money in the account ran out, Ron was supposed to keep up the property and loan payments himself and then sell it, but Ron stopped making payments.  [*Id.* at 179.]  Durr testified that around 2008 he started receiving notices from Bank of America

7

regarding late payments, and it was at this time he saw a lawyer in Dothan to discuss bringing suit because of Ron scamming the family.

Durr testified that he received a letter from a law firm in July of 2009 stating that Bank of America had accelerated the debt and was foreclosing on the property. [*See* R. 39-2 at 2.] He stated that he also received several letters from Bank of America, but he failed to produce any letter from Bank of America after the July 2009 letter from the law firm; he only produced earlier bank statements from 2007. [R. 54 at 159.] He also testified that he had spoken with several individuals from various Bank of America branches about the property and working out an agreement to get the property out of foreclosure. But he produced no evidence corroborating his story.

Durr stated that he eventually decided that he would drive to Atlanta, on a Saturday, to attempt to come to some kind of agreement about the foreclosed property. He said he would stay the weekend to visit and then attempt to visit a branch of Bank of America on Monday, his day off. He admitted his trip was over a year after receiving the initial letter from the law firm and that he did not notify anyone from Bank of America that he was coming, let alone attempt to make an appointment with a loan officer from the bank. [*Id.* at 155–56.] He admitted the debt on the foreclosed property was over $70,000 and therefore the $21,175 would

8

not satisfy the debt.  [*Id.* at 159–60.]  But he stated he hoped to make some kind of arrangement with the bank and use any remaining funds to repair the property, which was in very poor condition, and then rent or sell the property.  [*Id.* at 155–56, 159–60.]

Durr produced no other evidence during his case besides his own testimony, bank documentation evidencing a line of credit, and documentation of the deed to the property.  He did not call his father, grandmother, Lett, or any other individual to corroborate his story.

The court concluded that based on the totality of the facts, the government had proven by a preponderance of the evidence a substantial connection between the currency and illegal drug activity.  In its finding of facts, the district court relied upon seven factors:

> (1) the odor of marijuana that Deputy Crane detected when he approached the vehicle during the stop; (2) Durr's initial denial of currency being in the vehicle and his inconsistent behavior regarding the currency; (3) Lett and Durr['s use of] a third-party's vehicle with a single vehicle key; (4) the amount of currency Durr was transporting and the manner in which it was bundled, bagged, and hidden under the passenger seat; (5) the odor of narcotics detected by the K-9 on both the currency and the vehicle; (6) Durr's drug-related criminal history, coupled with Lett's prior drug conviction; and (7) Durr's inability to provide a legitimate source for the currency or plausible purpose for transporting it.

[R. 41 at 5–6.]

9

Durr makes two challenges on appeal.  First, he challenges the sufficiency of the evidence in the district court's order finding the government met its burden of proving a substantial connection between the currency and illegal drug activity.  Second, he challenges the admittance of his prior drug conviction under Federal Rule of Evidence 609.

### III.

"In an appeal from an *in rem* civil forfeiture, we review the district judge's factual findings for clear error, and his conclusions of law *de novo*." *United States v. $125,938.62*, 537 F.3d 1287, 1293 (11th Cir. 2008).

We review a district court's evidentiary rulings for abuse of discretion. *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305 (11th Cir. 1999).  "[U]nder the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *In re Rasbury*, 24 F.3d 159, 169 (11th Cir. 1994).  When applying an abuse of discretion standard, we must affirm unless we determine that the district court has made a clear error of judgment, or has applied an incorrect legal standard. *See SunAmerica Corp., Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1333 (11th Cir. 1996) (internal quotation marks and citation omitted).  But even if a ruling

10

constitutes an abuse of discretion, it will result in reversal only if the ruling

had a "substantial prejudicial effect." *Judd v. Rodman*, 105 F.3d 1339, 1341

(11th Cir. 1997).

## IV.

Section 881(a)(6) provides that "[a]ll moneys . . . furnished or intended to be

furnished by any person in exchange for a controlled substance . . . , all proceeds

traceable to such an exchange, and all moneys . . . used or intended to be used to

facilitate any violation of this subchapter" are subject to forfeiture to the United

States government.  Under the Civil Asset Forfeiture Reform Act, the government

must prove "by a preponderance of the evidence[] that the [currency] is subject to

forfeiture," that is, that there is a "substantial connection between" the currency

and illegal drug activity.  18 U.S.C. § 983(c)(1) and (3).  Pursuant to § 881(a)(6),

the government is not required to demonstrate that the seized currency was

connected with any particular drug transaction; instead, the government need only

show that the money was "related to some illegal drug transaction." *United States

v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) (en banc).

Durr contends the district court clearly erred in finding the government met

its burden of establishing by a preponderance of the evidence that the seized

11

currency was substantially connected to illegal drug activity.  Durr challenges each

of the reasons given by the district court in finding in favor of the government.[5]

First, Durr makes much of the fact that we have repeatedly held that

transporting "'[a] large amount of currency, in and of itself, is insufficient to

establish' . . . the currency was used in connection with an illegal drug

transaction."  [Appellant's Br. at 26 (quoting *United States v. $121,100.00*, 999

F.2d 1503, 1507 (11th Cir. 1993)).]  However, we have also noted that it is

nonetheless "highly probative of a connection to some illegal activity."

*$121,100.00*, 999 F.2d at 1507.  Thus, the presence of a substantial amount of

currency and the district court's finding—which is not clearly erroneous—that

Durr failed to credibly explain why he withdrew money from his bank account and

---

[5] As a preliminary matter, we are somewhat hesitant to conclude the district court properly admitted evidence of Durr and Lett's prior drug convictions under Federal Rule of Evidence 404(b)(2) as evidence of their intent to commit the unspecified and unproven drug offense at issue in this case.  While it is true that "[p]rior convictions for drug trafficking are considered highly probative of intent to commit current drug trafficking offenses," *United States v. Brown*, 587 F.3d 1082, 1091 (11th Cir. 2009), we are less sure that prior convictions are probative of intent in a case such as this where the government need not prove intent to commit a particular drug offense, *see $242,484.00*, 389 F.3d at 1160 (stating that the government need only prove seized currency is "related to some illegal transaction").  It would seem in this case the prior convictions evidence would only be relevant to show that in the past Durr and Lett committed drug offenses, and therefore, one should infer that this currency is somehow linked to some previous drug transaction—precisely what Rule 404(b)(1) prohibits.  Nevertheless, we need not decide the issue.  As detailed below, any error is harmless because there is nonetheless sufficient evidence to support the district court's findings of fact and conclusions of law, and therefore, Durr was not substantially prejudiced.

12

stashed it under his grandmother's bed weighs in favor of finding the currency was connected to illegal drug activity.

Second, Durr's argument against the significance of Cierra's alert to drug odor on the currency is similarly unpersuasive. He relies on language in opinions from our sister circuits that question the probative value of an alert to drug odor on currency given the high percentage of currency in circulation that is tainted with drug residue. But he failed to present any evidence at trial on the subject. *United States v. $242,484.00*, 389 F.3d 1149, 1165–66 (11th Cir. 2004) (declining to adopt the "global contamination theory" that currency in circulation is tainted without specific evidence that that effect). He also questions the reliability of Cierra's alert. However, the government not only produced testimony from her trainer Deputy Duke, but also evidence of her extensive certification and ongoing training to demonstrate she was a reliable drug-sniffing dog. *See United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982). The district court found Deputy Duke's testimony and the records of Cierra's certification credible, and Durr presented no evidence demonstrating the district court's finding was clearly erroneous. *See United States v. Clay*, 376 F.3d 1296, 1302 (11th Cir. 2004). Thus, it was appropriate for the district court to weigh Cierra's alert in the government's favor. *See $242,484.00*, 389 F.3d at 1166.

13

Third, Durr challenges the district court's finding that his explanation for his travel to Atlanta was implausible. Durr contends that he produced evidence that he did in fact own property in Atlanta and that the property was in foreclosure; therefore, the district court should have concluded his story was credible. But his testimony was that over one year after receiving a notice of foreclosure, he decided to drive to Atlanta on a Saturday morning, without an appointment or notifying Bank of America, and with over $20,000 in currency to attempt to speak with a bank officer about satisfying a debt totally over $70,000. He called no other witnesses to corroborate his story—not his father who allegedly loaned him $5,000 of the currency seized by the government, not his grandmother who allowed him to store his life savings under her bed, and not Lett, his travel companion. And he never clearly explained what the transaction with Ron entailed in the first place. Thus, the district court was entitled to disbelieve Durr's testimony, and its finding was not clearly erroneous.[6]

Given the implausibility of Durr's explanation for his traveling to Atlanta, that he was found transporting a large sum of currency, the manner in which he was transporting the currency, and that Cierra alerted to drug odor on the currency,

---

[6] There was also nothing erroneous about the district court finding it suspicious that Durr and Lett smelled like drugs and alcohol. And while driving a third party's car with a single key is innocuous enough in itself, considering the other circumstantial evidence, the district court did not err in finding the evidence indicative of illegal drug activity.

14

the district court did not err in concluding it was more likely than not that the currency was substantially connected to illegal drug activity. Thus, there was sufficient evidence that the currency was subject to forfeiture.

V.

Finally, Durr contends the district court abused its discretion by not excluding the evidence of his prior conviction under either Federal Rule of Evidence 403 or 609(b) because the evidence's prejudicial impact significantly outweighed its probative value, particularly because he was convicted in 1996—16 years before trial. He also contends the district court committed reversible error in admitting the conviction for impeachment purposes before he decided to testify and place his character at issue.

We hold that the district court did not abuse its discretion in admitting evidence of Durr's drug conviction for impeachment purposes. First, any prejudice Durr could have suffered from the district court admitting the evidence before he testified is negated because he did ultimately testify in the case. Second, although he was convicted in 1996, Durr was not released until 2007, less than ten years from the date of the trial. *See* FED. R. EVID. 609(b) (prohibiting evidence of a felony conviction when "more than 10 years have passed since the witness's conviction *or release from confinement, whichever is later*," unless the evidence's

15

probative value substantially outweighs its prejudicial effect and the adverse party is given reasonable notice of the proponent's intent to use the evidence) (emphasis added). Thus, Rule 609(b)'s limitation is inapplicable. Finally, there is no evidence demonstrating the district court otherwise abused its discretion in admitting the evidence under Rule 403. And at any rate, given the substantial evidence supporting forfeiture, even had the district court erred, the error would be harmless.

## VI.

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.