[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13877

_____

D.C. Docket No. 3:17-cv-01911-LCB

DOUGLAS FUQUA,

Plaintiff – Appellant,

versus

BRETT TURNER,
Federal ATF Agent,
ADAM NESMITH,
Federal ATF Agent,
JIMMY COLLIER,
Alabama State Fire Marshall,

Defendants – Appellees,

FRANK WILLIAMSON,
Colbert County Sheriff,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(May 6, 2021)

Before WILLIAM PRYOR, Chief Judge, GRANT and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Douglas Fuqua sued Alabama Deputy Fire Marshal Jimmy Collier and several law enforcement officers—Colbert County Sheriff Frank Williamson, Federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agents Adam Nesmith and Brett Turner, and other unnamed officers—in connection with a fire inspection Collier performed on Fuqua's nightclub. The District Court dismissed the claims against the law enforcement officers and entered summary judgment for Collier on qualified immunity grounds. Fuqua appeals the judgment dismissing the claims against the ATF Agents and the entry of summary judgment for Collier. We affirm.

## I.

### A.

The facts construed in the light most favorable to Fuqua are as follows.

Fuqua owned an unlicensed nightclub in Colbert County, Alabama known as "The Pig." The Pig had a large assembly area with a bar and an entertainment system, a game room with a gambling table, a kitchen, and a private bedroom that served as Fuqua's residence. Sheriff Williamson estimated that he received a complaint about The Pig "at least once a week," usually about overcrowding, loud

music and noise, cars blocking the road, illegal alcohol and drug sales, fights, and gun shots.

On September 16, 2015, Sheriff Williamson asked Deputy Collier to conduct an inspection of The Pig for reported problems of "overcrowding." The two visited The Pig that same day and brought along additional officers from the Sheriff's Department due to "safety concerns" Collier had about The Pig. Fuqua was elsewhere when they arrived, but came to The Pig shortly after when two men[1] inside called him on the phone. Collier told Fuqua he was with the Alabama Fire Marshal's Office and that he "need[ed] to do a fire inspection." He also asked Fuqua to accompany him throughout The Pig as he conducted the inspection. Fuqua did not expressly consent nor expressly refuse, but allowed Collier to conduct the inspection while Fuqua accompanied him. According to Collier, Fuqua was "agreeable" and "polite."

Collier inspected the large assembly area where he noted several electrical code and fire code violations, then he proceeded to the kitchen where he noticed a shotgun propped up next to a deep fryer, then the game room where he documented still more violations. Finally, Collier came to a locked door which Fuqua told him led to Fuqua's bedroom. Collier either asked Fuqua to unlock it or told Fuqua "I need to get in there, open the door," which Fuqua did. Collier

---

[1] The record is silent as to who these two men were.

3

wanted to inspect the bedroom because the adjacent game room contained two "extreme hazards"—a 20-pound tank of liquid propane gas and a deep fryer—and he wanted to be sure there was nothing similar in the bedroom. Upon entering the room, Collier saw a second shotgun propped up beside the door.

All in all, Collier recorded nineteen or twenty code violations. He plugged the violations into a program that then generated an official inspection report with a reinspection scheduled for no later than October 5th, 2015. Collier sent a copy of the inspection report to Fuqua by mail.

Collier returned to The Pig for a reinspection on October 21, 2015—the delay having been caused by an illness in Collier's family. Collier arrived unaccompanied by law enforcement officers this time; his interaction with Fuqua during the first inspection was sufficiently "friendly" that he no longer felt the need for protection. When Collier arrived, he called Fuqua on the phone and Fuqua agreed to drive to The Pig to meet him. When Fuqua arrived, he let Collier into The Pig and Collier inspected the same rooms as last time, including Fuqua's private bedroom. Collier did not notice any shotguns in The Pig this time, but his reinspection showed that Fuqua had corrected only three of the violations flagged on the first inspection. Accordingly, the inspection report generated by Collier's program stated that a third inspection would be conducted no later than November 17, 2015.

On November 3, 2015, Deputy Collier, Sheriff Williamson, and agents from various law enforcement agencies[2]—including ATF Agents Nesmith and Turner—convened to discuss The Pig. Collier told the Agents he had observed two shotguns on his first inspection of The Pig and was planning another follow-up inspection within the month. It was agreed that Collier's follow-up inspection would take place on November 16th—that being a day on which both Collier and the Agents were available—and that Collier would tell Nesmith if he saw any more firearms.

Fuqua was not at The Pig on November 16, 2015, when Collier arrived to conduct the follow-up inspection, so Collier called him, told him he "needed to reinspect" The Pig, and waited for him to arrive. After about twenty minutes, Fuqua arrived and let Collier into The Pig. As on the last occasion, Collier was not accompanied by law enforcement. Collier observed several outstanding code violations and also noticed the first shotgun was back in its old place beside the deep fryer. Collier again gained access to Fuqua's bedroom after telling Fuqua to "open the door," and upon entering Collier saw the second shotgun. Collier took pictures of the shotguns and told Nesmith about them by text message.

---

[2] The agencies included the ATF, the drug task force of the Colbert County Sheriff's Department, and the State Bureau of Investigation. The Colbert County District Attorney and police chiefs for Muscle Shoals, Sheffield, and Tuscumbia were also present at the meeting.

Within hours, Nesmith obtained a search warrant for The Pig based in part on Collier's observation of the shotguns. Nesmith then searched The Pig and found three shotguns, a pistol, and ammunition. Fuqua was arrested and on March 30, 2016 was indicted in the United States District Court for the Northern District of Alabama for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). *See United States v. Fuqua*, 3:16-cr-83-VEH-TMP (N.D. Ala.). Following his indictment, Fuqua moved the district court to suppress the seized firearms and ammunition on the ground that they were the fruit of a poisonous tree: Collier's warrantless search of The Pig on November 16, 2015 in violation of the Fourth Amendment. The District Court granted his motion and on September 1, 2016, entered an order granting the Government's motion to dismiss Fuqua's indictment with prejudice.

B.

On November 13, 2017, Fuqua filed the present lawsuit in the District Court against Collier, Williamson, Nesmith, Turner, and several unnamed sheriff's deputies and federal agents, in their individual and official capacities. His complaint sought compensatory and punitive damages and injunctive relief against Defendants under 42 U.S.C. § 1983 for conspiring to violate and violating his Fourth Amendment rights when Collier searched The Pig and Fuqua's private

bedroom without a warrant.[3] His complaint sought the same relief under Alabama law for unlawful entry and search, false arrest, and false imprisonment. And his complaint sought additional relief under 42 U.S.C. § 1985(3) for conspiracy to deprive him of equal protection rights.

On December 8, 2017, Sheriff Williamson moved the District Court to dismiss Fuqua's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6), arguing that Fuqua's claims against him were barred by the statute of limitations to the extent they arose from the September search and that he was entitled to qualified immunity and Eleventh Amendment immunity for the federal claims and state-law immunity for the state claims.[4] The District Court agreed and on January 22, 2018, granted Williamson's motion.

On December 22, 2017, Collier also moved the Court to dismiss Fuqua's complaint under Rule 12(b)(1) and (b)(6), arguing that Fuqua's claims against him were barred by the statute of limitations and the Eleventh Amendment. The District Court granted Collier's motion in part and denied it in part, concluding that the statute of limitations and the Eleventh Amendment barred all but Fuqua's

---

[3] We note that 42 U.S.C. § 1983 does not provide a viable cause of action against the ATF Agents since they are federal officers and therefore were not "acting under color of state law." *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971). Accordingly, the District Court construed his § 1983 claims as *Bivens* claims.

[4] Williamson's claim of state-law immunity was based on Article I, § 14 of the Alabama Constitution.

claims against Collier in his individual capacity arising from the November 16, 2015 search.

On February 27, 2018, the ATF Agents moved the Court to dismiss Fuqua's complaint pursuant to Rule 12(b)(1), (b)(5), and (b)(6). The Agents argued that Fuqua's individual-capacity claims should be dismissed because Fuqua failed to serve them with process consistent with Federal Rule of Civil Procedure 4. They also argued that the claims were barred by a combination of the statute of limitations, qualified immunity, absolute immunity,[5] and failure to state a claim. The District Court agreed that the Agents had not been properly served and that, even if they had been, they were entitled to qualified immunity for the individual-capacity claims. The Court accordingly dismissed the claims against the Agents.

On April 18, 2019, Collier moved the Court to enter summary judgment on the claims Fuqua brought against him in his individual capacity, arguing that qualified immunity and state-law immunity[6] barred the claims. As exhibits to his motion, Collier attached materials from Fuqua's § 922(g)(1) prosecution: the suppression-hearing transcript containing testimony from Collier and Williamson[7]

---

[5] The ATF Agents argued that Fuqua's state-law claims should be reconstrued as claims under the Federal Tort Claims Act and that they had absolute immunity under the Act.

[6] Collier's state-law immunity defense arose from Article I, § 14 of the Alabama Constitution and Alabama Code §§ 6–5–338.

[7] Fuqua's counsel cross-examined Collier and Williamson at the suppression hearing.

and a copy of the order[8] suppressing the firearms and ammunition seized from The

Pig on November 16, 2015. The District Court "decline[d] to consider as facts the

findings" set out in the order, but did consider the testimony from Collier and

Williamson in the suppression-hearing transcript. The District Court agreed that

Collier was entitled to qualified immunity with respect to the federal claims

because, assuming Collier violated Fuqua's Fourth Amendment rights, the

violation was not clearly established. As to Fuqua's remaining state-law claims,

the Court concluded that Collier had immunity under Alabama law. Accordingly,

the Court granted summary judgment for Collier and entered a final judgment

dismissing the case. Fuqua appealed.

## C.

On appeal, Fuqua argues the District Court erred in four ways: (1) by

considering Collier's testimony in Fuqua's criminal case in ruling on Collier's

motion for summary judgment; (2) by finding Collier entitled to qualified

immunity;[9] (3) by finding that the ATF Agents were not properly served with

process; and (4) by finding that the ATF Agents were entitled to qualified

---

[8] To be precise, the exhibit was a copy of a report and recommendation the magistrate judge submitted to the District Court and that the Court adopted in its order granting Fuqua's motion to suppress.

[9] Fuqua does not argue the District Court erred in finding Collier immune from the state-law claims by virtue of Alabama law and has therefore abandoned the issue on appeal. *See Fed. Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 373 n.3 (11th Cir. 1987) ("[I]ssues that clearly are not designated in the appellant's brief normally are deemed abandoned.").

immunity.  Fuqua's brief on appeal, like his arguments in the District Court below, focuses only on the third inspection of The Pig on November 16, 2015.  So we likewise confine our analysis to that inspection.  *See Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012) ("The law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." (alterations adopted) (quotation marks omitted)).

After the benefit of oral argument, we conclude that the District Court's reliance on the suppression-hearing transcript was proper and that it committed no error in finding Collier entitled to qualified immunity.  We also affirm the District Court's decision to dismiss the claims against the ATF Agents.  We lack personal jurisdiction over the individual-capacity claims against the Agents because they were improperly served, and the official-capacity claims against them are barred by sovereign immunity.

## II.

In ruling on Collier's motion for summary judgment, the District Court considered the suppression-hearing transcript from Fuqua's § 922(g)(1) prosecution and particularly the testimonies of Collier and Williamson contained therein.  Fuqua argues this was error because a court may only "take judicial notice of what was said and what the judge ruled in another court proceeding."  It may

10

not, according to Fuqua, "take judicial notice of the contents of a public filing for proof of the truth of factual matter asserted in the filing." We believe Fuqua misframes the issue.

The question is whether sworn testimony from a related judicial proceeding is the type of evidence that courts can consider on a motion for summary judgment. Federal Rule of Civil Procedure 56(c) governs this question. It provides that parties can support or oppose summary judgment motions by citing to materials in the record, including:

> depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]

Fed. R. Civ. P. 56(c)(1)(A).

We regard testimony in a judicial proceeding as functionally equivalent to deposition testimony since it is given under oath and with the opportunity for cross-examination. Accordingly, we hold that such testimony can be considered on a motion for summary judgment. *Cf. Bozeman v. Orum*, 422 F.3d 1265, 1267 n.1 (11th Cir. 2005) (approving consideration of sworn statements given before court reporters even without the opportunity for cross-examination on the ground that such statements are "at least as reliable as signed affidavits"), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015). Other circuits to address the question have, it seems, unanimously agreed. *See*

11

*Advance Fin. Corp. v. Isla Rica Sales, Inc.*, 747 F.2d 21, 27 (1st Cir. 1984);

*Shulins v. New Eng. Ins. Co.*, 360 F.2d 781, 785 (2d Cir. 1966); *Fletcher v. Bryan*,

175 F.2d 716, 717 (4th Cir. 1949); *Askew v. Bloemker*, 548 F.2d 673, 679 (7th Cir.

1976); *Ramsouer v. Midland Valley R. Co.*, 135 F.2d 101, 103, 106 (8th Cir. 1943);

*Fisher v. Shamburg*, 624 F.2d 156, 162 n.7 (10th Cir. 1980); *Langston v. Johnson*,

478 F.2d 915, 918 n.17 (D.C. Cir. 1973).

The District Court therefore committed no error in relying on the testimonies

from Fuqua's criminal case.

III.

We review a district court's entry of summary judgment *de novo*, viewing all

evidence in the light most favorable to the nonmoving party and resolving

reasonable inferences in his favor. *Al-Rayes v. Willingham*, 914 F.3d 1302, 1306

(11th Cir. 2019). Summary judgment is only proper if there is no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a).

Qualified immunity protects government officials "from liability for civil

damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Qualified immunity

balances "the need to hold public officials accountable when they exercise power

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567, 124 S. Ct. 1284, 1295 (2004) (Kennedy, J., dissenting)).

Qualified immunity protects government officials from money damages for acts taken while engaged in a discretionary function[10] unless the plaintiff shows: (1) that the facts alleged, construed in the light most favorable to the plaintiff, establish that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080 (2011); *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018). Although courts have discretion to choose which of the two prongs to tackle first, the Supreme Court has cautioned that "[c]ourts should think carefully before expending 'scarce judicial resources' to

_____

[10] Fuqua's brief on appeal states in a conclusory manner that "Defendant Collier never acted within his discretionary authority," but since Fuqua never raised this issue in the District Court, we will not consider it for the first time on appeal. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004).

13

resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" *al-Kidd*, 563 U.S. at 735, 131 S. Ct. at 2080 (quoting *Pearson*, 555 U.S. at 236–37, 129 S. Ct. at 818). The general principle that courts should "not [] pass on questions of constitutionality . . . unless such adjudication is unavoidable" will often counsel in favor of resolving cases on the second prong. *See Pearson*, 555 U.S. at 241, 129 S. Ct. at 821 (quoting *Scott v. Harris*, 550 U.S. 372, 388, 127 S. Ct. 1769, 1780 (2007) (Breyer, J., concurring)).

We will not consider a right to be "clearly established" unless its contours were sufficiently clear that every reasonable officer would have understood that what he was doing violates that right. *al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083. A plaintiff may show that a right was "clearly established" through: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016) (quoting *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). However it is shown, "clearly established law" must not be defined "at a high level of generality," *al-Kidd*, 563 U.S. at 742, 131 S. Ct. at 2084, but must instead be "particularized" to

14

the facts of the case, *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).

The District Court below skipped over the question whether Collier violated Fuqua's Fourth Amendment rights and instead decided that, to the extent there was any violation, it was not clearly established. The settled principle that warrantless searches are generally unreasonable did not, in the Court's view, make this case one controlled by "a broad statement of principle within the Constitution, statute, or case law" because of the administrative nature of the November 16, 2015 fire inspection and the fact that The Pig was a commercial establishment in a "closely regulated" industry.

On appeal, Collier defends the District Court's conclusion that he is entitled to qualified immunity on two alternative grounds. First, Collier argues the District Court correctly concluded that given the administrative nature of the search, it was not clearly established that he needed Fuqua's consent to justify the warrantless search. Second, he argues that even if it were clearly established that he needed consent, he would still be entitled to qualified immunity because Fuqua failed to show that he did not have consent to search The Pig or Fuqua's private bedroom therein.

We do not decide whether the District Court correctly concluded that the administrative nature of the inspection obviated the need for a warrant or consent

15

because we believe a reasonable officer in Collier's position could have believed he had consent. We affirm the District Court's conclusion that Collier was entitled to qualified immunity on that basis. *See Long v. Comm'r of IRS*, 772 F.3d 670, 675 (11th Cir. 2014) ("[W]e may affirm on any ground that finds support in the record."). We note, however, that Collier's second argument improperly places the burden on Fuqua to show he did not consent to the search when in fact the burden rests with Collier to prove he did. *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007); *Bashir v. Rockdale County*, 445 F.3d 1323, 1328 (11th Cir. 2006).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's prohibition on unreasonable searches and seizures applies to both commercial premises and private homes. *New York v. Burger*, 482 U.S. 691, 699–700, 107 S. Ct. 2636, 2642 (1987); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311–12, 98 S. Ct. 1816, 1819–20 (1978). Traditional police searches as well as "administrative inspections designed to enforce regulatory statutes" are within the Fourth Amendment's ambit. *Burger*, 482 U.S. at 699–700, 107 S. Ct. at 2642.

16

Warrantless searches are "*per se* unreasonable under the Fourth Amendment."[11]  *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967).  There are, however, "a few specifically established and well-delineated exceptions" to this general rule.  *Id.*

It is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *United States v. Freyre-Lazaro*, 3 F.3d 1496, 1500–01 (11th Cir. 1993) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043–44 (1973)).  To be valid, however, consent must be the product of a free and voluntary choice rather than the result of mere "acquiescence to a claim of lawful authority."  *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).  "Whether an individual's consent to a warrantless search was given voluntarily is a question of fact that must be decided in light of the totality of the circumstances."  *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) (citing *Schneckloth*, 412 U.S. at 227, 93 S. Ct. at 2047), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009).  The officer who conducted the warrantless

---

[11] Although this general rule applies in both the criminal and administrative contexts, *Barlow's, Inc.*, 436 U.S. at 311–12, 98 S. Ct. at 1819–20, administrative search warrants or "inspection warrants" may be obtained upon a lesser showing than the probable cause that is required for a traditional search warrant, *West Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 957 (11th Cir. 1982).

search bears the burden of proving that the search was justified by consent. *McClish*, 483 F.3d at 1241; *Bashir*, 445 F.3d at 1328.

Even when an officer has consent to conduct a search, he violates the Fourth Amendment if he goes beyond the scope of consent. *See Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803–04 (1991). The standard for measuring the scope of consent is an objective one—the question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* "The scope of a search is generally defined by its expressed object." *Id.* at 251, 111 S. Ct. at 1804.

Although it is difficult to tell, Fuqua appears to challenge both Collier's search of The Pig and of Fuqua's bedroom within The Pig. The first question is whether Collier introduced sufficient evidence for us to conclude that a reasonable officer could have thought his search of The Pig justified by virtue of Collier's free and voluntary consent. If so, the question becomes whether a reasonable officer could have understood the scope of consent to extend to Fuqua's bedroom. We answer each question in turn and ultimately answer both in the affirmative. It follows that Collier was entitled to qualified immunity.

18

A.

The contours of valid consent are fairly well-established when it comes to searches of private dwellings by law enforcement officers. In that context, we have been reluctant to "sanction[] entry into the home based upon inferred consent." *Gonzalez*, 71 F.3d at 830 (quotation marks and citation omitted) (alterations in original). We have therefore held that an officer does not obtain valid consent to search a home merely because the homeowner fails to verbally or physically object to his entering the home. *See id.* at 829–30; *Bashir*, 445 F.3d at 1329. In *Gonzalez*, for instance, we held that an officer did not have consent to enter a home when he merely followed the homeowner into her house after she said she needed to get a drink of water. *Gonzalez*, 71 F.3d at 829–30. Her failure to bar the officer's follow-on entry could not, we said, "be viewed as an adequate implied consent to that warrantless intrusion." *Id.* at 829. Similarly, in *Bashir*, we held there was no implied consent when an officer followed Bashir into his home after he withdrew from a conversation with the officer to tend to his crying son. 445 F.3d at 1329. Consent could not "reasonably be inferred," we said, "from Bashir's simple act of disengaging from conversation with [the officer] and walking into the house." *Id.*

We have also held that no valid consent exists when an officer gains entry into the home by a show of force or "official authority." So, for instance, in *United*

*States v. Edmondson*, 791 F.2d 1512, 1514–15 (11th Cir. 1986), we said

Edmondson did not consent to an FBI agent entering his home to arrest him when,

after hearing an agent yell "FBI. Open the Door," he opened the door, stepped

back, and placed his hands on his head.  In determining that Edmondson did not

voluntarily consent to the intrusion, we considered it important that Edmondson

knew his apartment was surrounded by FBI agents.  *See Edmondson*, 791 F.2d at

1515.  We reaffirmed this principle in *McClish*, 483 F.3d at 1241, where an officer

reached into McClish's home and pulled him out when he opened his door, and

again in *Moore v. Pederson*, 806 F.3d 1036, 1044–46 (11th Cir. 2015), where an

officer crossed the threshold of Moore's home to arrest him after Moore, in

submission to the officer's commands, turned around and put his hands behind his

back.  In both cases, we said the officers violated the Fourth Amendment by

entering the homes without valid consent.  *McClish*, 483 F.3d at 1241; *Moore*, 806

F.3d at 1046.

In a few cases, however, we have found that the totality of the circumstances

supported a finding of voluntary consent to search a private dwelling.  In *United

States v. Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002), we addressed whether

Ramirez-Chilel consented to officers entering his home when, in response to their

request for admittance to search the home for evidence of counterfeit immigration

documents, he stepped aside from the threshold and let the officers inside.  In

20

holding that Ramirez-Chilel's consent was free and voluntary, we distinguished *Edmondson* and *Gonzalez*. *Ramirez-Chilel*, 289 F.3d at 751–52. *Edmondson* did not control, we said, because unlike in that case, the officers did not have their guns drawn and there were not "a large number of officers surrounding" Ramirez-Chilel's home. *Id.* at 751. As for *Gonzalez*, we noted there was a difference "between the failure to object when officers follow someone into their home and the act of 'yielding the right-of-way' to officers at the person's front door." *Id.* at 752. While Ramirez-Chilel did not give the officers "explicit verbal consent . . . to enter, the officers did receive some sort of implied consent to enter from Ramirez-Chilel's body language that was not present in *Gonzalez*." *Id.*

We also found voluntary consent for officers to search the defendant's residence in *United States v. Pineiro*, 389 F.3d 1359 (11th Cir. 2004). In that case, four FBI agents showed up to Pineiro's house, which they suspected was being used as a marijuana grow site. *Pineiro*, 389 F.3d at 1362. Pineiro was not home when the agents arrived, so the agents talked with Pineiro's parents and brother who lived across the street until Pineiro arrived. *Id.* Once Pineiro arrived, the agents identified themselves and told him they wanted to "look around" his house. *Id.* Pineiro agreed and accompanied the agents through the house as they conducted their search. *Id.* at 1363. In affirming the district court's conclusion that Pineiro gave his voluntary consent to the search, we noted four things: (1) the

21

agents "identified themselves and explained the purposes of their search"; (2) none of the four agents who entered Pineiro's house had his gun drawn or visible; (3) Pineiro verbally consented to the search; and (4) Pineiro led the agents "on a tour of his home" and "cooperated with their search efforts . . . [by] moving his dog into the garage and then into the yard to enable the agents to enter." *Id.* at 1366.

Putting all this together, we have a fairly defined picture of when law enforcement officers have effective consent to search private residences for evidence of criminal activity. We know that the mere failure to object to an officer's entry into the home does not constitute valid consent to the entry, but that some affirmative indication, even if non-verbal, that the officers are welcome to enter may be enough. We also know that an officer cannot procure valid consent by force or intimidation, whether verbal or physical. Finally, we know what factors might tip the determination one way or the other: how many officers are present; whether the officers are armed, whether the arms are visible, and whether they are drawn; whether the agents explain the purpose of the search; and whether the homeowner actively aided the officers in searching his home.

Less clear, though, is how these principles map onto the context of the present case, which differs from the foregoing cases in at least three significant respects. First, the officer here is a deputy fire marshal rather than a conventional law enforcement officer. Second, the purpose of the search—at least facially—was

22

to uncover violations of the fire code rather than evidence of criminal activity. And third, the premises searched here were a public establishment that was part of a highly regulated industry and the private bedroom within that public establishment. Even if Collier's conduct would have violated Fuqua's Fourth Amendment rights under the principles applicable to law enforcement officers conducting traditional law enforcement searches of standalone private dwellings, Fuqua has not directed us to any cases that would put an officer on clear notice that those principles apply in the same way within the quite different context in which Collier acted. *See al-Kidd*, 563 U.S. at 741, 131 S. Ct. at 2083 ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate" for a violation to have been clearly established).

Were this a case involving the unmistakable indicia of a consentless search, we might be compelled to say that Fuqua's rights against the inspection were clearly established notwithstanding the lack of any on-point cases in the administrative-searches context. *See Perez*, 809 F.3d at 1222 (recognizing that a right might be clearly established in the absence of on-point case law if the conduct giving rise to the violation is "so egregious that a constitutional right was clearly violated"). But this is not such a case. The record shows that when Collier arrived at The Pig on November 16, 2015 and discovered that Fuqua was elsewhere, he called Fuqua on the phone and told Fuqua he "needed to reinspect" The Pig for

23

code violations.  Fuqua then drove to The Pig—a roughly twenty-minute drive—and let Collier in.  Importantly, Collier was alone and there is no indication that he used force or threats to gain admission.

At most, the facts viewed in the light most favorable to Fuqua support a finding that Collier gained admission by a claim of right rather than a request for admission—a finding which would cast doubt on the legality of Collier's inspection.  *See Amos v. United States*, 255 U.S. 313, 315–17, 41 S. Ct. 266, 267–68 (1921) (declining to find "waiver" of Fourth Amendment rights when defendant's wife let officers search the home after they told her "that they were revenue officers and had come to search the premises 'for violations of the revenue law'"); *Johnson v. United States*, 333 U.S. 10, 12–13, 68 S. Ct. 367, 368 (1948) (entry into defendant's home was "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right" when officer knocked, announced himself as an officer, and said "I want to talk to you a little bit").  But this alone does not come close to the sort of egregious conduct that gives rise to a clear violation in the absence of any on-point case law.

We conclude, therefore, that a reasonable officer in Collier's position could have believed he had Fuqua's effective consent to enter The Pig to conduct an inspection.  This entitles Collier to qualified immunity for his search of the public section of The Pig.

24

B.

Having established that Collier was entitled to qualified immunity for his search of The Pig's public areas, the question becomes whether he was also entitled to immunity for his search of Fuqua's private bedroom inside The Pig. We conclude that he was, since a reasonable officer could have believed that the general consent to search The Pig included consent to inspect the bedroom.

Collier inspected The Pig three times over the course of three months and each inspection included Fuqua's private bedroom. When Fuqua let Collier into The Pig after he told Fuqua he "needed to reinspect" The Pig for a third time, therefore, he could have reasonably believed not only that Fuqua was allowing him to inspect The Pig's public areas, but also that he was permitting him to inspect Fuqua's bedroom as on previous occasions. And while the "sacrosanct" nature of the home in the Fourth Amendment context may well counsel against construing consent to enter a public establishment to include consent to enter a private dwelling therein, *Moore*, 806 F.3d at 1039, Fuqua has not pointed us to anything that would have put Collier on notice that the consent did not so extend.

We therefore conclude that Collier was entitled to qualified immunity for his search of Fuqua's bedroom.

25

IV.

When a district court dismisses a plaintiff's complaint for insufficient service of process, we apply a *de novo* standard of review to the law and a clear error standard to any findings of fact. *Albra v. Advan, Inc.*, 490 F.3d 826, 828–29 (11th Cir. 2007).

Proper service of process is a jurisdictional prerequisite. *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). If service is not perfected within 90 days after the complaint is filed, the district court ordinarily "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). But like other aspects of personal jurisdiction, objections to service of process can be forfeited. *Pardazi*, 896 F.2d at 1317. A party "confer[s] personal jurisdiction on the court by consent" insofar as it fails to raise objections in its pre-answer motion to dismiss. *Id.* And once a party confers personal jurisdiction, the district court may not dismiss the action based on the overlooked defect. *Id.*

The District Court below dismissed all the claims against the ATF Agents without prejudice because it found the return receipts did not bear the required addressee signatures. But the ATF Agents had argued in their motion to dismiss only that Fuqua's "individual capacity claims are barred due to insufficient service of process." They never challenged service in relation to Fuqua's official-capacity

26

claims. Because they consented to personal jurisdiction over the latter, the District Court should not have concluded that "all claims against [the Agents] are due to be dismissed" based on improper service of process. But we agree that the District Court did not abuse its discretion in dismissing the individual-capacity claims on this basis.

To serve a United States officer, a plaintiff must also serve the United States. Fed. R. Civ. P. 4(i)(2)–(3). Serving the United States requires, among other things, sending "a copy of the summons and of the complaint" to the United States Attorney General by registered or certified mail. Fed. R. Civ. P. 4(i)(1).[12] Certified mail is "[m]ail for which the sender requests proof of delivery in the form of a receipt signed by the addressee." *Certified Mail*, Black's Law Dictionary (11th ed. 2019); *see also Republic of Sudan v. Harrison*, 139 S. Ct. 1048, 1057

---

[12] To serve the United States, a plaintiff must:

> (A) (i) deliver a copy of the summons and of the complaint to the United States attorney for the district where the action is brought–or to an assistant United States attorney or clerical employee whom the United States attorney designates in a writing filed with the court clerk–or
>
> (ii) send a copy of each by registered or certified mail to the civil process clerk at the United States attorney's office;
>
> (B) send a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C.; and
>
> (C) if the action challenges an order of a nonparty agency or officer of the United States, send a copy of each by registered or certified mail to the agency or officer.

Fed. R. Civ. P. 4(i)(1).

(2019). Service by certified mail therefore requires the addressee or his authorized agent to sign the return receipt. *See Olsen v. Mapes*, 333 F.3d 1199, 1202, 1204–05 (10th Cir. 2003) (agreeing with district court that service was not perfected under Rule 4(i)(1) in part because of unsigned return receipts, but reversing district court's decision to dismiss the case with prejudice); *cf.* Ala. R. Civ. P. 4(i)(2)(C) ("Service by certified mail shall be deemed complete and the time for answering shall run from the date of delivery to the named addressee or the addressee's agent as evidenced by signature on the return receipt.").

Fuqua sent Attorney General Jeff Sessions a copy of the summons and complaint by certified mail, but the District Court, after examining the return receipt "at enhanced magnification," found that it was unsigned. We have reviewed the copy of the return receipt in the record and we see no trace of a signature. The District Court therefore did not abuse its discretion in finding that Fuqua failed to serve the Attorney General as required by Rule 4(i)(1).

Although that deficiency alone renders service inadequate, the District Court also correctly found that Fuqua failed to properly serve the Agents themselves. Certified mail was a proper vehicle for serving the Agents in this case since Rule 4(i) allows service of United States officers in their individual capacities in accordance with the law of the forum state, and since Alabama law allows service by certified mail. Ala. R. Civ. P. 4(i)(2)(A) ("When the plaintiff files a written

28

request with the clerk for service by certified mail, service of process shall be made by that method.").  The District Court found, however, that the return receipts "appear not to be signed by the [Agents] themselves, but by the mail room of the ATF Huntsville Satellite Office."  After reviewing the return receipts, which indeed appear to have been signed by "Mail Room," we agree that Fuqua did not serve the Agents through certified mail.

Fuqua responds that the ATF Agents never proved that the mail room was not authorized to accept service on their behalf.  Delivery to an authorized agent is another permissible method of service.  Fed. R. Civ. P. 4(e)(2)(C); *see also* Ala. R. Civ. P. 4(i)(2)(C).  But Fuqua, not the Agents, bore the burden to prove whether the mail room was an authorized agent.  *Aetna Bus. Credit, Inc. v. Universal Decor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. Unit A 1981).  He has presented no evidence on this issue, so he necessarily fails to satisfy his burden of proof.  *United States v. Taylor*, 417 F.3d 1176, 1183 (11th Cir. 1985). We conclude that the District Court did not abuse its discretion in finding that Fuqua failed to serve the Agents as required by Rule 4(i).

Fuqua argues that these service deficiencies should be excused because "there has been substantial compliance with Rule 4" and because "the Government [was] given actual notice of the suit and has suffered no prejudice."  While we have sometimes excused minor service defects when they have neither prejudiced

29

the defendant nor deprived him of notice, *see Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 900–01 (11th Cir. 1990) (excusing the failure of summons to specify the return date for a responsive pleading), we decline to apply that principle here. This is not a case where the plaintiff accidentally omitted an inconsequential detail from the summons. Rather, Fuqua simply failed to ensure the Attorney General received a copy of the summons and complaint and therefore failed to serve a necessary entity—the United States. *See Albra*, 490 F.3d at 828–29 (declining to excuse plaintiff's failure to serve defendant with a copy of the complaint even where plaintiff was *pro se* and defendant had actual notice of the lawsuit). We therefore affirm the District Court's decision to dismiss the claims against the ATF Agents without prejudice.

Although the District Court found that it lacked jurisdiction due to the foregoing service defects, it nonetheless went on to discuss a second reason why Fuqua's individual-capacity claims would be dismissed—because the Agents had qualified immunity. Because jurisdiction depends on sufficient service of process, the Court was without jurisdiction to determine whether the Agents were entitled to qualified immunity. *See Pardazi*, 896 F.2d at 1317. We accordingly vacate the portion of the Court's order discussing qualified immunity. *See Thermoset Corp. v. Bldg. Materials Corp of Am.*, 849 F.3d 1313, 1315 (11th Cir. 2017).

V.

Returning to Fuqua's official-capacity claims, we conclude that these claims are barred by a different jurisdictional defect: sovereign immunity.  *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994).  Although the District Court did not reach this issue, we may affirm based on any ground supported by the record.  *Long*, 722 F.3d at 675.  And sovereign immunity precludes official-capacity claims against federal agents unless the plaintiff has "a substantive right to relief and an explicit Congressional consent authorizing such relief."  *Swank, Inc. v. Carnes*, 856 F.2d 1481, 1483 (11th Cir. 1988) (quotation marks and citation omitted).

Fuqua has no authorization to sue.  He pleaded two § 1983 claims and a § 1985(3) claim.  Because § 1983 does not apply to federal officers, the District Court construed his § 1983 claims to be *Bivens* claims.  But there is no such thing as an official-capacity *Bivens* claim.  *Farmer v. Perrill*, 275 F.3d 958, 963 (10th Cir. 2001).  Nor is a § 1985(3) claim cognizable as an official-capacity claim. *Davis v. U.S. Dep't of Just.*, 204 F.3d 723, 726 (7th Cir. 2000).  Accordingly, the District Court lacked "jurisdiction over the[se] claim[s] because the United States has not consented to its officials being sued in their official capacities."  *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007).

31

**SO ORDERED.**