[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10288

Non-Argument Calendar

_____

RHONDA BOYETTE,

Plaintiff-Appellant,

versus

MARCUS ADAMS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:19-cv-01802-LCB

_____

Before JORDAN, ROSENBAUM, and GRANT, Circuit Judges.

PER CURIAM:

Rhonda Boyette appeals the district court's partial grant of summary judgment in favor of Detective Marcus Adams and its decision to not exercise supplemental jurisdiction over her state law claims. With respect to her claims of illegal seizure and malicious prosecution brought pursuant to 42 U.S.C. § 1983, the district court determined that Detective Adams was entitled to qualified immunity. Because we agree that Detective Adams was entitled to qualified immunity and that the district court acted within its discretion in declining to exercise its supplemental jurisdiction, we affirm. [1]

I

Ms. Boyette was married to James Monte Long, Sr. from 2011 to 2014. Together they had a son, J.L., who was born in 2011. In 2014, Shortly after the couple divorced in 2014, Mr. Long filed a report of child abuse with the City of Madison Police Department ("MPD") after finding J.L. with bruising on his face and right buttock. Mr. Long submitted with the report pictures of J.L.'s bruises and a text message from Ms. Boyette admitting that she had caused

---

[1] Although Ms. Boyette labeled her second claim as a false arrest, it properly was, and was treated by the district court as, a claim for malicious prosecution because the relevant arrest was effectuated pursuant to a warrant. *See Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Ms. Boyette's arguments on appeal acquiesce to this characterization.

the injury.  The pictures depicted bruising on J.L.'s face and a large red imprint of a hand on his buttock.

On June 18, 2016, Mr. Long filed another report with the MPD concerning a bruise on J.L.'s leg that J.L. claimed was from his mother.  He again included pictures.  The MPD closed a subsequent investigation due to lack of supporting evidence.

In February of 2018, the MPD received a report from the principal of J.L.'s school that J.L. had arrived at school with a note addressed to his counselor.  According to the note, Mr. Long made J.L. take off his clothes and took pictures.  Detective Adams began investigating the potential production of child pornography.

Detective Adams went to Mr. Long's residence to ask about the pictures.  According to Detective Adams, the two had been acquainted but he did not recognize Mr. Long's name from the report or initially realize who Mr. Long was upon seeing him in person. Mr. Long explained to Detective Adams that he took the pictures to document J.L.'s injuries, as he believed that J.L. was "getting the hell beat out of him" by Ms. Boyette.  The pictures depicted a large bruise on J.L.'s right buttock and an adjacent large, discolored bruise on his upper right leg.

In continuing that investigation, Detective Adams shifted to focusing on potential child abuse and arranged a forensic interview for J.L. at the National Children's Advocacy Center ("NCAC"). During that interview, J.L. was largely unresponsive but admitted that his mother spanked him, including on his buttocks and back

with a belt but did not use the belt "anymore." The MPD closed the case.[2]

A related medical examination concluded that the marks on J.L.'s skin were normal childhood injuries. It also found no signs of acute or chronic injury.

In November of 2018, J.L.'s godmother and court-appointed observer, Rebecca Goodsell, contacted Detective Adams about concerns of Ms. Boyette abusing J.L. Ms. Goodsell apparently was Mr. Long's girlfriend, but the timeline and nature of their relationship is unclear from the record. Detective Adams denied any knowledge of that relationship at the time of the investigation.

Ms. Goodsell emailed to Detective Adams pictures of J.L.'s bruising and a recorded conversation between her and J.L. about the bruising. In that conversation, J.L. repeatedly stated that he did not know where or how he got the bruises on his back. Eventually, however, he did state that several weeks prior his mother had spanked him with a wooden paddle. He claimed that his mother switched to a wooden paddle "because [she believed] the belt [had not] been working."

Detective Adams advised Ms. Goodsell to file a police report and she did so several days later, including images of J.L.'s bruising

---

[2] According to Detective Adams, the conclusions of that report of "unfounded" and "no crime committed" referred to the initial child pornography case and not the case of physical abuse.

from the most recent incidents.  The set of pictures depicted a pair of faded bruises on J.L.'s lower back, and another on his left hip and upper left buttock.

In early December of 2018, Mr. Long emailed Detective Adams photographs of J.L. he had taken several days before.  The pictures depicted large, discolored bruises on J.L.'s back, and smaller bruises on his lower back, right buttocks, and several on his right hip.  Ms. Boyette admitted that, approximately one week earlier, she had given J.L. three "licks" with the paddle.

Detective Adams initiated another investigation and contacted the Alabama Department of Human Resources ("DHR").  Detective Adams also set up another forensic interview with the NCAC, this time with December Guzzo, who was familiar with and previously had interviewed J.L. on two occasions.  In preparation, she reviewed all of J.L.'s prior interviews, discussed them with previous examiners, and reviewed the photographs of his injuries.

During the interview with Ms. Guzzo, J.L. stated that his mother had spanked him a single time with the paddle for not getting dressed, which "hurt a lot."  That occasion did not leave a bruise, but a week prior he had three bruises on his "bottom" from another paddling when his mother hit him three times.  J.L. also appeared to point at his lower back and buttocks when indicating where his mother paddled him.  There were "a lot of other times" that a spanking left him with "red" and "blue" bruises from either a belt or the paddle.  His mother was the only person who paddled him.  The spankings made him "not happy," and he wanted them

to stop.  He was able to see the bruises on his backside in pictures his father showed him.  During the interview, J.L. drew a picture of the paddle unprompted.  Detective Adams observed the interview from a live video feed in another room.

Based on the interview, Ms. Guzzo opined that J.L. finally was of an age where he could provide reliable and consistent information, as he narrated freely in his own words when prompted with open-ended questions and provided specific sensory details about his experiences.  Ms. Guzzo believed that, because J.L. was a focused and willing cooperator in the interview and appeared to be drawing information from his own experiences, there was no indication of bias or "coaching" in his statements.  She further noted that he did not provide leading answers, such as by saying "my dad or mom told me to say," or provide a one-sided recitation of the facts.  Finally, she opined that, in her experience, the nature of J.L.'s bruising and the emotional impact of the punishment exceeded the acceptable range of corporal punishment and, thus, was abuse.

The day after J.L.'s forensic interview with Ms. Guzzo, Ms. Boyette and her husband, Haden Boyette, visited the MPD with J.L.  Detective Adams told them that there was an open case concerning J.L. and scheduled to speak with Ms. Boyette at a later date.  Mr. Boyette claimed that Mr. Long had "put up" J.L. to say that he was being sexually abused by Mr. Boyette, but Detective Adams explained that he was not a suspect and that the case did not involve any allegations of sexual abuse.  Meanwhile, Mr. Long filed another report of abuse to J.L.

Several days later, Ms. Boyette arrived for her scheduled interview with Detective Adams and signed a *Miranda* waiver form. *See Miranda v. Arizona*, 384 U.S. 436 (1966). She assumed she was there because J.L. "told [her] his dad told him to say stuff and called him Judas." Detective Adams showed her the pictures of J.L.'s bruises, of which she claimed to not know the origin but admitted to paddling J.L. on multiple occasions. She said that she did not know how J.L. incurred his injuries but did not blame anyone else.

Ultimately, Detective Adams informed Ms. Boyette that she was under arrest for child abuse based on the cases dating back to 2014 and J.L.'s recent statements in the interview with Ms. Guzzo. Specifically, Detective Adams arrested Ms. Boyette on suspicion of violating Ala. Stat. § 26-15-3, which provides that "[a] responsible person . . . who shall torture, willfully abuse, cruelly beat, or otherwise willfully maltreat any child under the age of 18 years shall, on conviction be guilty of a Class C felony."

Upon being placed in handcuffs, Ms. Boyette attempted to hand Detective Adams several papers, which he believed to be related to her divorce with Mr. Long. Ms. Boyette replied: "No, it's about his daughter talking about what he did to her." Detective Adams declined to review the papers as they did not concern J.L.

After arresting Ms. Boyette, Detective Adams returned to the MPD lobby to inform Mr. Boyette of his wife's charges. Mr. Boyette avers that he asked Detective Adams to speak to J.L., which Detective Adams declined to do, allegedly stating that he did

not care what J.L. had to say at that point and that he had heard everything he needed to hear from J.L.

Eventually, the charges against Ms. Boyette were dismissed for improper venue.  Detective Adams presented his case files and notes to a magistrate in the appropriate venue and applied for a warrant for Ms. Boyette's arrest. The magistrate typed the complaints for child abuse, which Detective Adams signed, found probable cause for the charges, and issued a warrant for Ms. Boyette's arrest.

In Detective Adams' experience, magistrates in the area consider repetitive bruising caused in the name of corporal punishment to be excessive, thus giving rise to probable cause for child abuse.  Detective Adams also believed that he had probable cause to arrest Ms. Boyette on the lesser offense of third-degree assault. Detective Adams was not involved in the independent investigation by the DHR, which later found that Ms. Boyette had not abused J.L.  According to Detective Adams, the DHR determines only whether to pursue remedial action for abuse, which does not impact his decision to seek a warrant.

Soon thereafter, Ms. Boyette voluntarily surrendered to law enforcement and bonded out of jail that same day.  The charges brought against her were dismissed the next month.  The county judge determined that J.L. had been directed by Mr. Long to make false allegations against Ms. Boyette and found Mr. Long in contempt of court, sentencing him to 120 days in jail.

Ms. Boyette then filed this § 1983 action, raising five claims against Detective Adams.  For her illegal seizure and malicious prosecution claims, she asserted that Detective Adams lacked probable cause to arrest her.  She also raised three related state-law claims.

## II

We review *de novo* a district court's grant of summary judgment, viewing the facts in the light most favorable to the non-moving party.  *See Terrell v. Smith*, 668 F.3d 1244, 1249-50 (11th Cir. 2012).  *See also Fuqua v. Turner*, 996 F.3d 1140, 1149 (11th Cir. 2021) (stating that all "reasonable" inferences must be resolved in favor of the non-moving party).  Summary judgment is appropriate when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quotation omitted). *See also* Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The mere fact that the record contains some scintilla of evidence to support the non-movant's position is not dispositive; "a 'genuine' dispute requires that the evidence is such that a reasonable jury could find for the non-movant." *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1049 (11th Cir. 2017).

### III

To proceed with her constitutional claims under § 1983, Ms. Boyette must overcome Detective Adams' defense of qualified immunity.  Qualified immunity shields government officials acting within their discretionary authority from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  "In this [C]ircuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016).

### A

Detective Adams was entitled to qualified immunity on Ms. Boyette's illegal seizure claim.  As explained below, he had at least arguable probable cause to arrest her.

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992).  "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

*Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (internal quotation marks omitted) (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)). To that end, probable cause requires more than mere suspicion but does not require convincing proof or the level of proof necessary to support a conviction. *See id.* (citations omitted). *See also Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) ("innocent behavior frequently will provide the basis for a showing of probable cause") (citing *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).

Even if probable cause does not exist, "arguable probable cause" still entitles an arresting officer to qualified immunity. *See Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Arguable probable cause exists "where reasonable officers in the same circumstances and possessing the same knowledge as the [arresting officer] could have believed that probable cause existed to arrest." *Id.* (citation omitted). Arguable probable cause employs a standard of objective reasonableness, such that it may be present "regardless of the officer's underlying intent or motivation." *Id.* Here, the undisputed facts could have led a reasonable officer to believe that Ms. Boyette violated Alabama law.

Detective Adams was aware about Ms. Boyette's potential abuse of J.L. in 2014, when he was a mere two years old. In a text message, she admitted to causing him injuries at that time. On four more occasions over the next four years, Mr. Long or Ms. Goodsell filed reports alleging abuse of J.L. by Ms. Boyette, with each report accompanied by photographic evidence. Those photographs

depicted bruising of varying degrees on J.L.'s backside—the back of his legs, lower back, hips, and buttocks. Ms. Boyette admitted to paddling J.L., including during a timeframe consistent with the last set of photographs submitted by Mr. Long.

Detective Adams also witnessed J.L. freely narrate his history of punishment, including being hit on his backside with a belt and paddle, and the pain and negative feelings he endured. J.L. stated that his mother was the only person who paddled him, and voluntarily drew a picture of the paddle. Ms. Guzzo, a child forensic interview specialist, believed that J.L. was sincere and that his answers were free of evidence of bias or coaching. And when Detective Adams interrogated Ms. Boyette, she did not direct the blame for J.L.'s injuries to any other person.

Ms. Boyette does not dispute these facts. Instead, she posits that a reasonable jury could find that Detective Adams was biased in favor of Mr. Long because they were acquaintances from 30 years prior. Ms. Boyette's theory has a shaky foundation. The bias, she claims, is evinced by Detective Adams ignoring evidence of coaching, such as in the recorded conversation between Ms. Goodsell and J.L. That recording, however, shows a concerned adult attempting to draw out an answer from a reticent child. Despite her repeated questioning, at no time did Ms. Goodsell lead or suggest an answer to J.L.

With respect to the forensic interview between Ms. Guzzo and J.L., Ms. Boyette asks that we infer coaching even though a specialist who was intimately familiar with J.L. found none. She

then turns to Detective Adams' failure to investigate her husband's allegations of coaching. But Detective Adams had no bona fide concern with coaching at that time given Ms. Guzzo's assessment, so it was not surprising that the first mention of sexual abuse allegations at the culmination of his investigation did not send him running to question J.L. Furthermore, it was within the purview of the NCAC to interview J.L., and such an interview had happened not one day prior.

Only reasonable inferences must be resolved in Ms. Boyette's favor. Ms. Boyette's line of logic of is simply too attenuated to create a genuine issue of material fact. *See Fuqua*, 996 F.3d at 1149; *Lee*, 284 F.3d at 1195. Detective Adams' investigation may not have been perfect, but the law does not demand perfection.[3]

In sum, Detective Adams correctly determined that he had probable cause to arrest Ms. Boyette based on years of repeated punishment of a child with a belt and paddle that purportedly left visible bruising, and which was supported by photographic evidence and testimony. At a minimum, a reasonable officer in his position could have believed that Ms. Boyette had committed a violation of Ala. Stat. § 26-15-3 by willfully abusing or cruelly beating

---

[3] Ms. Boyette places great weight on our decision in *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004), *abrogated in part on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). That decision is unpersuasive absent reasonable evidence of explicit bias. *See Kingsland*, 382 F.3d at 1229-31.

J.L., and therefore had arguable probable cause. *See Lee*, 284 F.3d at 1195; *Rankin*, 133 F.3d at 1435.[4]

Ms. Boyette's arguments to the contrary are unavailing. For starters, there is no dispute that "reasonable and appropriate" corporal punishment generally is permissible under Alabama Law. *See* Ala. Stat. § 13A-3-24(1); *Gates*, 884 F.3d at 1298. But this case was not about the legality of each isolated instance of punishment imposed upon J.L., but rather, Detective Adams' investigation of what appeared to be a pattern of violence (and resulting injuries) over many years amounting to abuse or assault. Even if Detective Adams was mistaken on the merits, the evidence required to support a finding of probable cause need not reach the level of proof necessary to support a conviction. *See Rankin*, 133 F.3d at 1435. *See also Gates*, 884 F.3d at 1298 ("The rationale behind qualified immunity is that an officer who acts reasonably should not be held personally liable merely because it appears, in hindsight, that he might have made a mistake."). Nor does the eventual dismissal of

---

[4] Detective Adams also reasonably believed that he had probable cause to arrest Ms. Boyette on the lesser offense of third-degree assault on a child. *See* Ala. Stat. § 13A-6-22. *See also Bombailey v. State*, 580 So. 2d 41, 43 (Ala. Crim. App. 1990) (affirming conviction for third-degree assault of a child for single incident of beating, including with a belt, that left bruising). If Detective Adams had probable cause or arguable probable cause to arrest for any offense, qualified immunity applied. *See Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1258 (11th Cir. 2010).

Ms. Boyette's charges affect the validity of her arrest. *See Marx v. Gumbinner*, 905 F.2d 1503, 1507 (11th Cir. 1990).

Ultimately, Ms. Boyette's attempts to create a genuine issue of material fact as to whether Detective Adams was entitled to qualified immunity for her illegal seizure claim fall short. Detective Adams was acting within his discretionary authority, and he was entitled to qualified immunity from Ms. Boyette's illegal seizure claim because he had probable cause, or at least arguable probable cause, for the arrest.

## B

Detective Adams also was entitled to qualified immunity on Ms. Boyette's malicious prosecution claim, as there was no genuine issue of material fact as to whether he reasonably believed that he had probable cause to arrest her. To establish a § 1983 malicious prosecution claim, a plaintiff must show: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures. *See Thompson v. Clark*, 142 S. Ct. 1332, 1337-38 (2022); *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). Under Alabama law, the elements for the common-law tort of malicious prosecution are (1) a judicial proceeding instituted or continued by the present defendant, (2) with malice and without probable cause, (3) that terminated in the plaintiff accused's favor, and (4) caused damage to the plaintiff accused. *See Grider*, 618 F.3d at 1256 (citing *Wood*, 323 F.3d at 882).

As to the second prong, "it is well established that an arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment." *Id.* (citations omitted). As such, the existence of probable cause defeats a § 1983 malicious prosecution claim. *See id. See also Washington v. Howard*, 25 F.4th 891, 904 (11th Cir. 2022) ("If an officer fully and honestly places evidence before the magistrate, reasonably believing that there is probable cause, those 'procedural steps . . . shield against a Fourth Amendment claim.'") (citing *Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019)).

Ms. Boyette argues that Detective Adams was not entitled to qualified immunity on her malicious prosecution claim because he lacked probable cause for the same reasons discussed above. Once again, she cannot show that Detective Adams lacked probable cause or arguable probable cause, or that in the context of this claim, that he unreasonably believed that he had probable cause when securing the warrant. *See id.*

Although Ms. Boyette does not change the tenor of her argument, several facts that were less relevant above merit mentioning here given the timing of her second arrest (which took place several months after her initial warrantless arrest). Such facts include the papers that Ms. Boyette handed to Detective Adams after she was initially placed under arrest, the allegations by Mr. Boyette against Mr. Long from that same day, and the Boyettes' request that Detective Adams speak with J.L. again. Ms. Boyette argues that had Detective Adams further investigated that evidence, he

may have determined that Mr. Long coached J.L. and that may have created an issue of fact as to whether there was actual probable cause to support the second arrest. *But see Lowe v. Aldridge*, 958 F.2d 1565, 1570 (11th Cir. 1992) (conflicting evidence did not negate probative value of incriminating evidence used to procure warrant in child abuse case, such that no genuine issue of material fact existed as to objective reasonableness of defendants' actions, warranting summary judgment on remand).

Detective Adams declined to review that evidence and his decision was objectively reasonable at the time. And he only needed to reasonably believe that he had probable cause in securing the warrant from the magistrate judge. The papers did not relate to J.L., and J.L.'s case did not concern allegations of sexual abuse. The very day before, Detective Adams sat and watched Ms. Guzzo interview J.L., who affirmed that his mother had paddled him on multiple occasions and otherwise physically punished him for years. Ms. Guzzo, a specialist in interviewing child abuse victims and who was familiar with J.L., believed that J.L. was sincere.

Given this context and his awareness of the complaints of alleged abuse to J.L. since his infancy, Detective Adams could have reasonably believed, in presenting his case files and notes to the magistrate, that he had probable cause to arrest Ms. Boyette on charges of child abuse. *See Washington*, 25 F.4th at 904. Because Ms. Boyette does not argue that Detective Adams made a material omission or excluded exculpatory evidence, and does not argue that the warrant was facially invalid, the magistrate's subsequent

determination of probable cause shields Detective Adams from liability. *See id.* Consequently, the district court did not err in granting summary judgment on qualified immunity grounds on Ms. Boyette's malicious prosecution claim.

## IV

The district court had original jurisdiction over Ms. Boyette's constitutional claims under § 1983 pursuant to 28 U.S.C. § 1331. There is no dispute that her constitutional claims arose out of a common nucleus of operative fact as the state law claims, namely, Detective Adams' investigation of J.L.'s injuries. The district court therefore had the authority and discretion to exercise supplemental jurisdiction over her state law claims. *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742-43 (11th Cir. 2006).

Such discretion may arise under four circumstances, but only one is relevant here, that is, whether "the district court has dismissed all claims over which it has original jurisdiction." *Id.* at 743. To that end, because the district court properly granted summary judgment on the constitutional claims, it acted within its discretion when it subsequently declined to exercise supplemental jurisdiction over state law claims that no longer had a federal anchor. *See Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11th Cir. 1999).

## V

We affirm the district court's grant of summary judgment on the federal claims.  We also affirm the district court's decision to not exercise jurisdiction over the remaining state-law claims.

**AFFIRMED**.